

DA 12-0242

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 51

STATE OF MONTANA,

       Plaintiff and Appellee,

   v.

RUSSELL ROY,

       Defendant and Appellant.


| | |
|---|---|
| APPEAL FROM: | District Court of the Thirteenth Judicial District, In and For the County of Yellowstone, Cause No. DC 11-145 Honorable Ingrid G. Gustafson, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

           Wade Zolynski, Chief Appellate Defender, Lisa S. Korchinski, Assistant Appellate Defender, Helena, Montana

      For Appellee:

           Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss, Assistant Attorney General, Helena, Montana


                        Submitted on Briefs:  February 6, 2013

                                     Decided:  February 26, 2013

Filed:

                      _____

                              Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     A peace officer stopped a vehicle that Russell Roy was driving. During the stop, the officer had Roy exit the vehicle so that the officer could detect whether the odor of marijuana was present. A large quantity of marijuana was ultimately discovered in the vehicle, and the State of Montana charged Roy in the Thirteenth Judicial District Court, Yellowstone County, with one count of felony criminal possession of dangerous drugs. Roy filed a motion to suppress the evidence, arguing that the officer had unlawfully exceeded the scope of the stop by requiring Roy to exit the vehicle. The District Court denied the motion. Roy then pleaded guilty to the charge, reserving the right to appeal the denial of his motion. We affirm.

¶2     The sole issue on appeal is whether requiring Roy to exit the vehicle during the traffic stop violated his constitutional right against unreasonable searches and seizures.

## BACKGROUND

¶3     On January 8, 2010, Detective Benjamin with the Yellowstone County Sheriff's Department received a Crime Stoppers tip that a woman was dealing marijuana out of her home, described as a yellow house, at 622 North 15th Street in Billings. The informant reported that the woman's name was Karrie and that she was tall (over six feet) with red hair and was well dressed. The informant also stated that the woman routinely drove her vehicle, a Jeep Cherokee, to California to pick up large quantities of marijuana and then drove back to Montana to distribute the drugs. The informant further stated that the Jeep Cherokee had a "YNP" (Yellowstone National Park) sticker in the back window.

2

¶4 Due to the detailed nature of this report, Benjamin decided to investigate. He learned that the home was owned by Karrie Johnson. Benjamin reviewed Johnson's picture on file with the Department of Motor Vehicles and determined that Johnson matched the description of the woman implicated in the Crime Stoppers tip. Benjamin later drove by Johnson's house and observed her getting into a Jeep Cherokee matching the informant's description.

¶5 In February 2010, Special Agent Anuszczyk with the Bureau of Alcohol, Tobacco, Firearms and Explosives provided Benjamin with information he had learned through an informant. The informant told Anuszczyk that a very tall woman named Johnson was selling large quantities of marijuana from her residence on the 600 block of North 15th or 16th Street. Furthermore, Johnson was planning to leave for another trip to California to pick up marijuana on February 22. Benjamin later learned through Anuszczyk that Johnson had delayed her trip due to illness and had ended up leaving on February 25. Benjamin confirmed that Johnson's vehicle was gone after February 25. He noted that a pickup, registered to Roy, was parked at Johnson's residence.

¶6 On March 4, 2010, Benjamin learned that Johnson would be returning home at around 10:00 that evening. Benjamin, Anuszczyk, and another member of the Eastern Montana High Intensity Drug Trafficking Area Task Force set up surveillance along Interstate 90 between Park City, Montana, and Billings. At around 9:45 p.m., they observed Johnson's Jeep Cherokee, with the YNP sticker, traveling eastbound on the interstate toward Billings. Benjamin placed a call to Sergeant Reid, a K-9 handler with the Billings Police Department. Benjamin provided Reid with the information he had

learned through his investigation, including the Jeep Cherokee's plate number and the fact that it possibly contained a large amount of marijuana. Benjamin requested that Reid assist with tracking the vehicle as it entered Billings. Benjamin specifically asked that Reid bring his K-9 dog.

¶7 Reid intercepted Johnson's vehicle on the interstate and followed as it exited onto Laurel Road. Reid paced the vehicle with his patrol car and determined that it was moving at 55 miles per hour, in excess of the posted 45-mile-per-hour speed limit. Reid initiated a traffic stop due to the vehicle's excessive speed and the report of drug trafficking. Immediately upon approaching the vehicle, Reid detected "a heavy odor of vehicle deodorizer, air-freshener" coming from the vehicle. He further observed that the vehicle had two occupants and that it appeared they had been traveling, as there was clothing, luggage, and some garbage strewn throughout the vehicle. The driver turned out to be Roy; Johnson was riding in the passenger seat. Reid noted that neither Roy nor Johnson had bloodshot eyes, slurred speech, or anything else—other than the use of deodorizer—that might further heighten his suspicion of wrongdoing. Roy's demeanor was pleasant, polite, and soft-spoken.

¶8 Following his initial interaction with Roy and Johnson, Reid returned to his patrol car with the vehicle registration and Roy's driver's license to run them through dispatch. Both Roy and the vehicle checked out clean, except that Roy's address did not match up with his driver's license. Reid decided to give Roy warnings for the excessive speed and the failure to update his address. Reid wrote out the warnings while still in his patrol car, which took approximately ten minutes. Reid also contacted Benjamin and reported that

4

he had stopped Johnson's vehicle. Reid then returned to Johnson's vehicle. Before issuing the warnings and returning the driver's license and vehicle registration to Roy, Reid asked Roy to exit the vehicle and accompany him to the rear of the vehicle. At the suppression hearing, Reid explained:

> I wanted to get a better observation of him. Also, it's not uncommon for me on traffic stops to have somebody step out of the vehicle and talk to them, especially if there is something not right, something going on. With the tip that I had [from Detective Benjamin] also and the deodorizer, I wanted to talk to him a little bit.

Reid further explained that he wanted to separate Roy from the strong deodorizer smell to determine if he could identify any odors on Roy. When Roy exited the vehicle, Reid smelled the odor of burnt marijuana coming from Roy or his clothes.

¶9 Reid briefly interviewed Roy, issued him the warnings, and returned his license and the vehicle registration. Reid then spoke with Johnson. He requested permission to search the vehicle, but she refused consent. When he asked her whether there was any cocaine, heroin, or methamphetamine in the vehicle, Johnson giggled, smiled, and said, "No, I'm not that way." But when he asked her whether there was marijuana in the vehicle, Johnson became noticeably stressed and firmly declared there was not. At around this time, Benjamin appeared and began interviewing Roy and Johnson. When asked where they were coming from, the two gave conflicting accounts. Reid deployed his police dog for a sniff search of the vehicle's exterior. The dog indicated on the open driver's window. After the dog search, Roy admitted there were drugs in the vehicle. He was taken into custody at this time. The vehicle was subsequently seized and searched. Law enforcement discovered approximately three pounds of marijuana inside.

5

¶10    As noted, the State charged Roy with one count of felony criminal possession of dangerous drugs, in violation of § 45-9-102, MCA (2009). After the District Court denied his motion to suppress, Roy entered into a plea agreement with the State and changed his plea to guilty. The District Court deferred imposition of sentence for three years, with conditions, and imposed a $500 fine.

## STANDARDS OF REVIEW

¶11    We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous. *State v. Hurlbert*, 2009 MT 221, ¶ 16, 351 Mont. 316, 211 P.3d 869. A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if a review of the record leaves this Court with a definite and firm conviction that a mistake has been made. *Hurlbert*, ¶ 16. We further review a district court's denial of a motion to suppress to determine whether the court's interpretation and application of the law are correct. *State v. Bieber*, 2007 MT 262, ¶ 20, 339 Mont. 309, 170 P.3d 444. Our review is plenary as to whether the court correctly interpreted and applied the law. *Bieber*, ¶ 20.

## DISCUSSION

¶12    Roy contends that being required to exit the vehicle during the traffic stop violated his constitutional right against unreasonable searches and seizures. This argument is premised on a particular understanding of the basis for the stop. In Roy's view, Sergeant Reid pulled him over solely for speeding. Roy does not challenge the validity of that stop, given that he unquestionably was violating a traffic law. Rather, Roy challenges what he perceives as an unlawful *expansion* of the stop from an investigation premised on

a traffic offense into "a fishing expedition" for evidence of other unlawful activity. Roy argues that once Reid had finished writing out the warnings he intended to give Roy, there was no reason for Reid then to ask Roy to exit the vehicle to issue him these warnings and return his driver's license and the vehicle registration. Roy maintains that the smell of a deodorizer was not a sufficient ground for prolonging an investigation premised solely on a speeding violation. *See Hurlbert*, ¶ 21 (a stop may not last longer than is necessary to effectuate the purpose of the stop, unless "additional objective data of wrongdoing" give rise to further suspicions and enlarge the scope of the investigation). He asserts that the stop should have concluded with the return of his paperwork and the issuance of the warnings, without requiring him to exit the vehicle. "When Sgt. Reid returned to the vehicle and ordered Roy to exit and walk to the rear of the vehicle, the investigative stop turned into an unlawful detention."

¶13    The State proffers two separate grounds for upholding Reid's action here. First, the State cites two decisions of the United States Supreme Court for the proposition that an officer effecting a lawful traffic stop may order the driver or passengers out of the vehicle pending completion of the stop, without running afoul of the Constitution. In *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S. Ct. 330 (1977) (per curiam), the Supreme Court upheld a state police officer's practice of ordering all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation, even if the officer had no reason to suspect foul play from the particular driver at the time of the stop. In *Maryland v. Wilson*, 519 U.S. 408, 117 S. Ct. 882 (1997), the Supreme Court extended this rule to passengers, holding that an officer making a traffic stop may order

passengers to get out of the vehicle pending completion of the stop. Significantly, in both cases, the Supreme Court specifically grounded this rule on concerns for "officer safety" arising out of "the possibility of a violent encounter" and "[t]he hazard of accidental injury from passing traffic." *Mimms*, 434 U.S. at 110-11, 98 S. Ct. at 333; *Wilson*, 519 U.S. at 412-14, 117 S. Ct. at 885-86. No such concerns are implicated in the present case, however. Reid did not ask Roy to exit the vehicle until near the end of Reid's investigation into the speeding offense; and Reid's avowed purpose in doing so was not for safety reasons, but to investigate whether Roy was engaged in additional wrongdoing. The District Court found that "the reason [Reid] requested Roy to exit the vehicle was to separate him from the vehicle to determine if he could identify any odors on Roy if he was out of the vehicle." Accordingly, this case does not present an opportunity to apply the rule of *Mimms* and *Wilson*.

¶14 The State's second argument is that Reid had sufficient suspicion of wrongdoing to justify requiring Roy to exit the vehicle. The State suggests that Reid did not "expand" his investigation at all because the traffic stop was based not only on excessive speed, but *also* on reliable, corroborated reports that the vehicle was involved in drug trafficking. This version of events finds support in the District Court's finding that "Reid initiated a traffic stop of the vehicle due to its excessive speed *and* the report of drug trafficking" (emphasis added). Thus, as the State's theory goes, having Roy exit the vehicle was encompassed within one of the two purposes for the stop: to ascertain whether the occupants were trafficking drugs. We agree with this argument.

8

¶15 Stopping an automobile and detaining its occupants constitutes a "seizure" under the Fourth and Fourteenth Amendments to the United States Constitution and Article II, Section 11 of the Montana Constitution, even though the purpose of the stop is limited and the resulting detention quite brief. *State v. Carlson*, 2000 MT 320, ¶ 18, 302 Mont. 508, 15 P.3d 893. Thus, the constitutional prohibition against unreasonable searches and seizures applies to investigatory stops of vehicles. *Carlson*, ¶ 18; *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 694-95 (1981); *State v. Gopher*, 193 Mont. 189, 194, 631 P.2d 293, 296 (1981).

¶16 An investigatory stop must be justified by "particularized suspicion." *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 695; *Gopher*, 193 Mont. at 194, 631 P.2d at 296; § 46-5-401(1), MCA. For a peace officer to have particularized suspicion justifying an investigatory stop, the officer must be possessed of (1) objective data from which the officer can make certain reasonable inferences and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense. *Brown v. State*, 2009 MT 64, ¶ 20, 349 Mont. 408, 203 P.3d 842. Under this standard, "the totality of the circumstances—the whole picture—must be taken into account," including "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers." *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 695; *see also State v. Rutherford*, 2009 MT 154, ¶ 12, 350 Mont. 403, 208 P.3d 389 (in evaluating the totality of the circumstances, the quantity, or content, of the information available to the officer and the quality, or degree of reliability, of that information must be considered). An officer may

9

rely on information conveyed by a third person to formulate particularized suspicion to stop a person. *State v. Gill*, 2012 MT 36, ¶ 16, 364 Mont. 182, 272 P.3d 60; *State v. Pratt*, 286 Mont. 156, 164-65, 951 P.2d 37, 42-43 (1997). An investigatory stop may not last longer than is necessary to effectuate the purpose of the stop. *Hurlbert*, ¶ 21; *Carlson*, ¶ 21; § 46-5-403, MCA. The scope of the detention must be carefully tailored to its underlying justification. *Carlson*, ¶ 21; *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983).

¶17 Here, Roy was exceeding the speed limit. A statutory violation is sufficient by itself to establish particularized suspicion for an officer to make a traffic stop. *State v. Haldane*, 2013 MT 32, ¶ 26, ___ Mont. ___, ___ P.3d ___. Added to this, Detective Benjamin had provided Sergeant Reid with corroborated information—the reliability of which Roy has not contested—that a Jeep Cherokee with a YNP sticker was traveling to Billings on Interstate 90, arriving at around 10:00 p.m. as reported by the informant, carrying a large amount of marijuana. Upon stopping a vehicle matching this description, Reid observed evidence inside the car of a long road trip, such as clothing, luggage, and garbage strewn throughout the vehicle. Furthermore, upon approaching the vehicle, Reid detected "a heavy odor of vehicle deodorizer" coming from the vehicle. Reid had roughly 20 years of law enforcement experience and was a 12-year veteran of the Billings Police Department. He had received training in drug interdiction and had conducted over 100 stops in which he investigated the presence of illegal drugs, the majority of which involved marijuana. In Reid's experience, an excessive deodorizer is "a little bit of a red flag" because "it's commonly used as a masking agent for marijuana."

¶18 We hold that these facts constituted a particularized and objective basis for Reid to suspect that, in addition to the traffic violation, Roy was committing an offense involving marijuana. Given this suspicion, Reid was justified in requiring Roy to exit the vehicle so as to separate him from the masking effect of the vehicle deodorizer—not unlike requiring a person suspected of driving under the influence of alcohol or drugs to exit the vehicle for field sobriety tests to confirm or dispel the suspicion of impairment. Contrary to Roy's theory of the case, this was not an "expansion" of the stop beyond its underlying purpose. Rather, it was a reasonable investigative action that fell within the scope of Reid's particularized suspicion that Roy was trafficking illegal drugs—which, again, was one of the two justifications upon which the traffic stop was predicated. For these reasons, the District Court correctly denied Roy's motion to suppress.

¶19 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JIM RICE