DA 22-0238

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 133

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JOSEPH BRIAN McELROY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Mineral, Cause No. DC-2019-53
Honorable Shane A. Vannatta, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Chad Wright, Appellate Defender, Joshua James Thornton, Assistant Appellate Defender, Helena, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Michael P. Dougherty, Assistant Attorney General, Helena, Montana

        Debra A. Jackson, Mineral County Attorney, Superior, Montana

Submitted on Briefs:  April 17, 2024

Decided:  June 25, 2024

Filed:

_____
            Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1  Joseph Brian McElroy (McElroy) appeals the denial of his motion to dismiss and the March 21, 2022 Judgment of the Fourth Judicial District Court, Mineral County. The court sentenced McElroy to five years suspended to the Montana Department of Corrections (DOC) for criminal possession of dangerous drugs with intent to distribute, a felony in violation of § 45-9-103(2), MCA. McElroy asserts the court erred by not granting his motion to suppress the evidence because the arresting officer unlawfully expanded a traffic stop into a drug investigation utilizing a canine sniff without sufficient particularized suspicion.

¶2  We reverse and remand to the District Court for action consistent with this opinion.

¶3  We restate the issue on appeal as follows:

*Whether the District Court erred by concluding there was sufficient particularized suspicion to expand the traffic stop into a drug trafficking investigation and conduct a canine sniff.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4  On October 11, 2019, Mineral County Trooper Adams initiated a traffic stop of a white Jeep that was driving seven miles over the speed limit. The driver of the vehicle was Daimoni Delavergne (Delavergne). McElroy was in the passenger seat. Trooper Adams testified "[m]y first observation was the level of nervousness of both the driver and the passenger, which was abnormal for just a speeding stop. I also observed the odor of marijuana coming from inside the vehicle. The vehicle also, to me, appeared to [] show signs of hard travel." Clarifying what hard travel looked like, Trooper Adams explained

2

the vehicle had bottles and trash strewn about, the cup holders were full, and McElroy had a pillow in his seat.

¶5      Trooper Adams had Delavergne sit in the patrol vehicle while he verified Delavergne's registration and information.  Based on the smell of marijuana, Trooper Adams also wanted to investigate whether Delavergne was under the influence.  Trooper Adams questioned Delavergne about his travels and learned the two men were traveling from Tacoma, Washington to Billings, Montana for a baby shower.  Based on the conversation, Adams did not suspect Delavergne was impaired.  Trooper Adams further testified that he learned the parties were driving a third-party vehicle that belonged to Delavergne's girlfriend.

¶6      Trooper Adams returned to the vehicle to confirm the vehicle identification number (VIN) matched the VIN on the registration information.  While at the vehicle, Trooper Adams spoke with McElroy to see if his story matched Delavergne's.  Trooper Adams testified that McElroy's and Delavergne's stories about their relationship and why they were travelling also did not match up.  Delavergne initially related he and McElroy were brothers, but later said they were like brothers because they grew close in foster care, whereas McElroy described their relationship as business partners who had met three years prior.

¶7      After returning to his patrol vehicle, Trooper Adams returned Delavergne's license and registration to him and stated he was only issuing a warning for speeding and lack of proof of insurance.  After telling Delavergne he was good to go, Trooper Adams detained them further by questioning Delavergne about the smell of marijuana he had initially

3

perceived. Delavergne mentioned that the smell lingered from smoking marijuana prior to the trip when they were in Washington. Delavergne denied consent to search the vehicle, and McElroy denied consent to search his belongings. As a result, Trooper Adams deployed the use of a canine to conduct a sniff test on the vehicle. The dog alerted to the front passenger door of the vehicle. Trooper Adams arrested both Delavergne and McElroy and had the vehicle towed to the Mineral County Sheriff's office. Trooper Adams secured a warrant to search the vehicle and seized cocaine, pills, five grams of marijuana, four cell phones, and $2,200 in cash.

¶8     McElroy was charged with criminal possession of dangerous drugs with intent to distribute, a felony in violation of § 45-9-103(2), MCA (2019). McElroy filed a motion to suppress the evidence, arguing the traffic stop was unlawfully extended because Trooper Adams lacked particularized suspicion to conduct the canine sniff. Before ruling on the motion, the District Court conducted an evidentiary hearing where Trooper Adams testified and explained his basis for expanding a traffic stop into a drug investigation. Based on the smell of marijuana coming from the car, the signs of hard travel, the exceeding level of nervousness, and Delavergne and McElroy's somewhat differing back stories, Trooper Adams concluded he had sufficient particularized suspicion to believe there could be drugs in the vehicle. Based on this testimony, the District Court found Trooper Adams had sufficient particularized suspicion to employ the canine sniff and denied McElroy's motion to suppress.

¶9     McElroy then entered a plea agreement with the State in which he pled guilty reserving the right to appeal denial of his motion to suppress and challenge the extension

4

of the traffic stop and deployment of the canine search. The District Court accepted McElroy's guilty plea and sentenced him to a five-year DOC commitment, all suspended, and credit for 26 days already served. The court also ordered McElroy to pay $2,410 in fines and court fees.

## STANDARD OF REVIEW

¶10 We review a district court's denial of a motion to suppress evidence to determine whether the court's factual findings are clearly erroneous and whether the court correctly interpreted and applied the applicable law to those facts. *State v. Noli*, 2023 MT 84, ¶ 24, 412 Mont. 170, 529 P.3d 813. The district court's findings of fact are clearly erroneous if they are not supported by substantial evidence, the court misinterpreted the effect of the evidence, or upon our independent review of the record, we are firmly convinced the court was mistaken. *Noli*, ¶ 24. Whether the court correctly interpreted and applied the pertinent law to the facts of the case is a question of law we review de novo. *Noli*, ¶ 24.

## DISCUSSION

¶11 *Whether the District Court erred by concluding there was sufficient particularized suspicion to expand the traffic stop into a drug trafficking investigation and conduct a canine sniff.*

¶12 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution both give people the right to be free from unreasonable searches and seizures of their "persons, houses, papers, and effects." U.S. Const. amend. IV; Mont. Const. art. II, § 11. To protect against unreasonable searches and seizures, police must obtain a warrant for the search of a person's home, body, or other place or thing, or for seizure of any person or thing. *State v. Peoples*, 2022 MT 4, ¶ 15, 407 Mont. 84, 502

P.3d 129. A temporary investigative stop, or *Terry* stop, is an exception to the warrant and probable cause requirements of the Fourth Amendment and Article II, Section 11. *Noli*, ¶ 30; *State v. Gopher*, 193 Mont. 189, 192-94, 631 P.2d 293, 295-96 (1981).

¶13 To initiate a traffic stop, a police officer must have particularized suspicion the occupant of the vehicle is engaging or has engaged in illegal behavior. Section 46-5-401(1), MCA. Additionally, under the Montana Constitution, a canine sniff constitutes a search, and thus police must have a particularized suspicion of unlawful activity to conduct one. *State v. Harning*, 2022 MT 61, ¶ 17, 408 Mont. 140, 507 P.3d 145. Particularized suspicion "requires objective data from which an experienced officer can make certain inferences and a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing." *Harning*, ¶ 17. Consideration of the quantity, substance, and reliability of the information known to the officer is relevant to determine whether there was particularized suspicion. Whether the officer had particularized suspicion is a question of fact reviewed under the totality of the circumstances. *Harning*, ¶ 17. An officer does not need to be certain or correct that a person is engaged in unlawful behavior, but "particularized suspicion requires more than mere generalized suspicion or an undeveloped hunch of criminal activity." *Harning*, ¶ 18.

¶14 Particularized suspicion is required to expand a traffic stop into a drug investigation. In *Harning*, this Court determined the smell of marijuana emanating from a vehicle, in conjunction with an admission to smoking it the same day outside of the vehicle, is sufficient to expand a traffic stop into a driving under the influence (DUI) investigation. *Harning*, ¶ 19. However, without any facts that are specific and particularized as to the

6

vehicle which would support a suspicion the *vehicle* itself contained illegal drugs, then a traffic stop may not be expanded into a possession of illegal drugs investigation. *Harning*, ¶ 19 (emphasis in original). This Court further elaborated in *Noli* what factors do not constitute sufficient particularized suspicion to expand a traffic stop:

> in the absence of some specific officer-articulated facts or inferences that are objectively indicative of some particular criminal activity, merely inconsistent accounts of a person's conduct, presence, or plans, unusually nervous or defensive behavior when monitored, stopped, confronted, or questioned by police, failure to make or maintain eye contact with police, use of a borrowed or rented vehicle, a messy, cluttered, or disheveled vehicle interior, presence at the scene of a crime, use of a highway commonly used for drug trafficking or other illegal activity, traveling to or from a city or area generally known as a source, destination, or situs of/for illegal drugs or other illegal contraband or activity, the desire to avoid contact with police, or other perfectly legal or innocuous conduct, behavior, or possessions are insufficient alone, whether individually or collectively, to support an objectively reasonable particularized suspicion of criminal activity.

*Noli*, ¶ 32.

¶15 Additionally, a traffic stop may not last longer than necessary to carry out the purpose of the stop. Section 46-5-403, MCA. Investigative stops may be prolonged, and the scope of the investigation expanded, only if "the scope of the investigation remains within the limits created by the facts and suspicions from which they arose." *Harning*, ¶ 15. Therefore, police must quickly and diligently "confirm or dispel the particularized suspicion of criminal activity that justified the initial stop, and any subsequent expansion in duration or investigative inquiry based on new or additional particularized suspicion of other criminal activity developed within the lawful scope or duration of the initial stop." *Noli*, ¶ 33. If an officer lacks particularized suspicion, and there is no other applicable search warrant exception, then the search and seizure is unconstitutional. *State v.*

7

*Zimmerman*, 2018 MT 94, ¶ 17, 391 Mont. 210, 417 P.3d 289.  Any evidence emanating from the illegal search must be suppressed.  *Zimmerman*, ¶ 17.  A seizure that is justified solely based on issuing a warning ticket to the driver becomes unlawful if it is prolonged beyond the time reasonably required to complete that mission.  *Noli*, ¶ 33.

¶16    Here, Trooper Adams had particularized suspicion to initiate a traffic stop because the vehicle was exceeding the speed limit.  Upon first approaching the vehicle, Trooper Adams observed the smell of marijuana coming from the vehicle.  Trooper Adams did not question Delavergne or McElroy at that time about the smell.  Instead, because of the smell, Trooper Adams requested that Delavergne accompany him in his patrol car so he could question Delavergne and determine if he was under the influence—in essence, proceeding with a DUI investigation.  After conversing with Delavergne while verifying his I.D. and registration, Trooper Adams concluded Delavergne was not impaired or under the influence.  The results of the DUI investigation dispelled Trooper Adams's particularized suspicion that Delavergne was driving impaired and, at this time, there was no indication Trooper Adams suspected there was marijuana in the vehicle.  It was not until *after* Trooper Adams returned Delavergne's I.D. and registration, informed him he would only be getting a warning, and told him he was good to go that Trooper Adams then extended the stop to question Delavergne about the smell of marijuana in the vehicle.  It was at that time Delavergne admitted he and McElroy had previously smoked in the vehicle when they were in Washington, where use of marijuana is legal.  The dissent tries to obfuscate the sequence of the stop, completely ignoring that Trooper Adams possessed all of the information the dissent belabors, dispelled his suspicion Delavergne was driving impaired

before he issued Delavergne a warning, and concluded the stop. With no new information, Trooper Adams then unlawfully prolonged the stop.

¶17 Under *Harning*, the smell of marijuana in the vehicle would be sufficient particularized suspicion to expand the traffic stop into a DUI investigation at most, not a drug possession investigation. *See Harning*, ¶ 19 ("although Harning was subjected to a traffic stop and DUI investigation, he retained a right of privacy in his vehicle which, absent particularized and articulable facts relating to his vehicle, could not be violated."). However, once Trooper Adams concluded the driver was not under the influence, returned the driver's personal information, gave the driver a warning, and told him he was good to go, the scope of the traffic stop and the DUI investigation was over, and Delavergne and McElroy should have been released. Without additional objective, particularized facts that would lead to a suspicion of drugs in the vehicle, Trooper Adams's investigation was completed well before he deployed the canine. An officer cannot expand the scope of a traffic stop unless he or she gains "new or additional objective indicia of other criminal activity, and formed an objectively reasonable new or additional particularized suspicion *before* [the officer] dispelled or completed, or reasonably should have completed, the initial particularized suspicion, purpose, or mission with reasonable diligence and unnecessary delay." *Noli*, ¶ 35 (emphasis in original). *Noli* further explains:

> At the point that the officer has 'dispelled the predicate particularized suspicion that justified the initial stop within its lawful scope and duration,' 'failed to observe or discover additional specific and articulable facts justifying expansion of the scope or duration of the stop based on a new or expanded particularized suspicion of criminal activity,' and completed or reasonably should have completed the valid purpose or mission of the stop, 'the stop must end without further delay.'

9

*Noli*, ¶ 35 (citing *State v. Zeimer*, 2022 MT 96, ¶ 30, 408 Mont. 433, 510 P.3d 100).

¶18 Because Trooper Adams completed the purpose of both his initial traffic stop and his DUI investigation and advised Delavergne he was good to go, Trooper Adams could not expand the scope of the initial Terry stop to a drug possession investigation without new or additional particularized suspicion that the vehicle itself contained illegal drugs. Trooper Adams did not question Delavergne or McElroy about the smell of marijuana until after he completed the traffic stop by giving Delavergne a warning and completed his DUI investigation by concluding Delavergne was not impaired. With the purpose of his mission and initial stop completed, any search conducted after that violated McElroy's Fourth Amendment rights and his rights under Article II, Section 11 of the Montana Constitution. *See Harning*, ¶ 24 ("An officer who impermissibly extends a detention just to fish for further evidence of wrongdoing breaches the protections afforded by the Fourth Amendment.").

¶19 The State asserts the smell of marijuana in the vehicle raised two possibilities: either Delavergne was impaired, or there was marijuana in the vehicle. As such, the smell emanating from the vehicle was sufficient particularized suspicion for Trooper Adams to conduct a canine sniff around the vehicle, especially after determining Delavergne was not impaired. Additionally, the State asserts this case differs from *Harning* because Trooper Adams observed several facts supporting his suspicion that there could be drugs in the vehicle itself. For example, he observed signs of hard travel, the fact they were travelling

10

from a known drug source, Delavergne's changing story, the use of a third-party vehicle, and the level of nervousness exhibited by both Delavergne and McElroy.

¶20 We do not find the State's assertions persuasive. First, Trooper Adams was aware of all the facts the State asserts provided suspicion there could be drugs in the vehicle *prior* to Trooper Adams concluding the stop for speeding and subsequent DUI investigation based on the smell of marijuana and advising Delavergne he was good to go. Second, as this Court noted in *Noli*, factors including signs of hard travel, traveling from a known drug center in a third-party vehicle, and nervous demeanor are insufficient, even when considered together, to constitute particularized suspicion. *Noli*, ¶ 32. Finally, this Court further elaborated in *Harning* that the smell of marijuana itself also does not constitute particularized suspicion sufficient to conclude there could be drugs in the vehicle. Thus, Trooper Adams did not have sufficient particularized suspicion to expand the traffic stop further into a drug possession investigation, and his further questioning of Delavergne about the marijuana smell and subsequent use of the canine sniff to do so was unlawful.

¶21 It is additionally worth noting that in *State v. Pierce*, 2005 MT 182, 328 Mont. 33, 116 P.3d 817, this Court found probable cause existed to seize Pierce's vehicle based on the odor of marijuana and the admission that someone else had smoked marijuana in the vehicle earlier that day. *Pierce*, ¶ 21.[1] We decline to address *Pierce's* applicability here because Delavergne was not questioned about and did not admit to smoking marijuana in

---

[1] *Harning* distinguishes itself factually from *Pierce* by noting the smell of marijuana and an admission to smoking outside of the vehicle earlier that day, as opposed to inside the vehicle, was not sufficient particularized suspicion to expand a traffic stop.

the vehicle until *after* Trooper Adams concluded his traffic stop and DUI investigation. Thus, Trooper Adams's questioning, the admission that followed, and the ensuing canine search were all outside the scope of his initial particularized suspicion.

## CONCLUSION

¶22    The District Court erroneously denied McElroy's motion to suppress the illegal drug evidence discovered pursuant to a subsequent search of the vehicle. The District Court's order denying McElroy's motion to suppress evidence and resulting 2022 judgment of conviction and sentence on the criminal possession of dangerous drugs with intent to distribute are hereby reversed.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR

Justice Jim Rice, dissenting.

¶23    I believe particularized suspicion for the canine sniff was established under proper application of the governing standards.

¶24    The Court engages in a "divide and conquer" approach that eliminates individual indicators that would demonstrate particularized suspicion if properly considered as part of the totality of the circumstances. Citing *Noli*, it completely dismisses from consideration the indicators, which it broadly characterizes as signs of hard travel, traveling from a

12

known drug center, using a third-party vehicle, and the suspects' nervous demeanor, because they are "insufficient, even when considered together, to constitute particularized suspicion." Opinion, ¶ 20. However, *Noli* did not hold these factors mean *nothing*; rather, it stated they did not constitute particularized suspicion when considered "alone." *Noli*, ¶ 32. The record reveals there were more indications than stated by the Court in its broad characterizations, which must be considered together.

¶25 Citing *Harning*, the Court reasons that because "the smell of marijuana itself also does not constitute particularized suspicion to conclude there could be drugs in the vehicle," there was insufficient suspicion to expand the traffic stop further to question the driver about the marijuana smell. Opinion, ¶ 20. Again, the Court reaches its insufficiency conclusion after separating this evidence into a separate compartment inconsistent with the totality of the circumstances. Further, Adams did not expand the stop to initiate a drug investigation; he had already initiated the drug investigation.

¶26 Remarkable about the Court's analysis is the quick dismissal of indicators without consideration of what the record explains about them. It further ignores the training that equips police to identify common drug trafficking indicators and make good drug recognition decisions. Science is not static; neither should be the caselaw premised upon it.

¶27 Trooper Adams graduated with a four-year bachelor's degree in criminal justice, and had served on the Montana Highway Patrol since 2014. He received specialized training in drug investigation, including a drug recognition expert school, known as ARIDE, and trainings with high intensity drug trafficking and national interdiction

13

organizations, including for use of canine detection. Trooper Adams is certified as a Drug Recognition Expert.[1]

¶28 While the Court, citing to *Noli*'s description of a "messy, cluttered, or disheveled vehicle," *Noli*, ¶ 32, dismisses that indicator as meaning nothing, the State established that there is more to the issue. Adams explained that, upon approaching the vehicle, he initially observed that "it appeared the two occupants had been on the road traveling a great distance in a very short amount of time," because of bottles and trash littered in the car, including the cupholders being full, with cigarettes, energy drinks, and food strewed about in the vehicle. Under questioning, Adams explained:

> Q. So they had a messy car. What does that usually mean, if anything?
>
> A. *It's not about a messy car*, it's about, from my knowledge of drug trafficking organizations, they recognize that they're the most vulnerable at transit. So therefore they attempt to mitigate that risk by traveling as fast as possible, not stopping and not throwing things away. So you'll see signs of what would be an unkept car or not removing garbage. [(Emphasis added.)]

Thus, while a messy or hard-traveled car may be innocent, the State here established it can also be an indicator of drug trafficking conduct. While insufficient as particularized suspicion when considered "alone," *Noli*, ¶ 32, or even with other innocent indicators, this indicator nonetheless may be considered in the context of the totality of circumstances from which the officer, in accordance with his training, is entitled to "make certain inferences." *State v. Estes*, 2017 MT 226, ¶ 17, 388 Mont. 491, 403 P.3d 1249.

---

[1] While not determinative here, the canine deployed in this case, "Bumper," is also nationally certified and is required to receive continuing training. Bumper is trained to detect marijuana, cocaine, methamphetamine, and heroin. Marijuana and cocaine were found here.

¶29 Adams noticed that the occupants of the vehicle appeared nervous and would not make eye contact with him. This may likewise be innocent behavior by the public, but not necessarily so:

> Q. You also provided testimony, I believe several times, you hit on the fact that the driver and passenger both appeared nervous. *Don't people get nervous when they're stopped by law enforcement?*
>
> A. *Yes.* People's nervousness can vary between persons that are interacting with law enforcement. *It becomes my job then to calm them down, [to] still that nervousness.* So in my interaction with people I attempt to be as friendly and amicable as possible to still those types of nerves. *However, in cases of criminal activity on the interstate, my demeanor does not diminish that and will still see evidence of those nerves, especially in other occupants in the vehicle who know their driver is getting a warning for speeding and insurance which is not consistent with my interactions with the lawful motoring public.* [(Emphasis added.)]

This indicator itself raises a salient point: when assessing particularized suspicion, the Court errs by applying rules mechanistically. Within the governing standard of totality of the circumstances, the Court must permit police to recognize nuance in human behavior based upon the particular facts. Of course, the State must make a sufficient record about these observations, but the Court should not be dismissive based merely upon broadly stated categories or general notions. Adams' observation, one of many, was that the nervousness of the occupants was excessive when compared to that exhibited by an ordinary motorist whose nervousness abates following an officer's calming efforts, specifically here, Adams' courtesies and his telling them he would be issuing only a warning for speeding and lack of proof of insurance. This was a permissible inference about the suspects' conduct drawn from the officer's observations and training.

15

¶30 Trooper Adams also learned, coming after he smelled marijuana from the car, the points of departure and arrival for the suspects' trip, beginning in Tacoma, Washington, and ending in Billings, Montana. As Adams testified, this information can be innocent, but it can also be an indicator of drug activity, specifically, organized drug trafficking:

> Q. And why is the location from where they're traveling from to the location where they're ultimately ending had any impact on your approach in this case?
>
> A. Yeah. *In and of itself, driving from Tacoma, Washington to Montana, there's nothing wrong with that.* However, in the context of an investigation or where there's totality of the circumstances, you look at Tacoma, where it's located, close to the border, my experience with people driving from Tacoma, I have had several instances of drug traffickers, drug trafficking originating in Tacoma, driving to an area in Montana where I know is a source within The State of Montana for dangerous drugs. Many investigations that I -- started in Billings, Montana. *So that whole totality added to my suspicion that this was maybe not just mere possession but a little more organized, more organized transport.* [(Emphasis added.)]

¶31 Trooper Adams also discovered that the vehicle was owned by a third party, not one of the occupants. Alone, this means nothing, but it could mean something in totality:

> Q. Let me stop you there. What is indicative of a third-party vehicle?
>
> A. In my opinion, as well as talking to drug traffickers who I have interacted with, they know the court system, they know that if they use their own vehicles to transport illegal drugs or other items, that property is subject to forfeiture . . . . *Third-party vehicles are significant to me because I know that the drug trafficking organizations attempt to avoid asset forfeiture by not having owners involved in the crime to be committed with the vehicle.* [(Emphasis added.)]

¶32 The third-party vehicle status, combined here with the lack of insurance documentation, was a reason for Adams to conduct a check to determine if the car had been reported stolen during the time the driver, co-Defendant Delavergne, was sitting in the

16

patrol car and Adams was writing the warning ticket. The vehicle had not been reported as stolen, but while Adams was writing a warning, Delavergne told Adams the "story" of the trip, a topic of conversation that had begun when Delavergne offered such information to Adams when Adams first approached the subjects' vehicle.

¶33 When Adams returned to the vehicle ostensibly to check the VIN for the possibility of a stolen vehicle, he intentionally spoke with Defendant McElroy about the suspects' trip. Adams noticed two things about Delavergne's and McElroy's accounts: they were inconsistent with each other, and they were changing during the course of the stop. This could be innocuous, but it could also be significant:

> Q. You indicated in your report that when you were talking to him that his story had changed and he didn't know what his -- when his cousin's baby was due or that indicated he was actually going to a baby shower. What is that -- why is that relevant at all?
>
> A. *Many times drug traffickers will create stories to validate their trips. They will do this in order to drop suspicion if they are stopped by law enforcement.* If they feel like they're losing their story they may amend their story or make it more -- I guess, so in this case I asked Mr. Delavergne, what are you traveling for. He told me they were going -- discussed his cousin having a baby. Later I asked if he knew the due date of the baby. And he told me he didn't know and he seemed very surprised that I would ask that. He then changed his story to say that it was a baby shower that he was going to.
> . . . . Their explanation for their association was different in a manner which was communicated to me. It didn't really make sense to me. Furthermore, there was other things. Mr. Delavergne told me that he was his brother and Mr. McElroy told me he didn't know what they were traveling for. Just to see friends. And it seemed unlikely to me that a close relation did not know about his cousin having a baby and on a long trip.
> . . . . *They don't really know each other and therefore they have to invent stories for reasons for knowing each other. And under pressure, while on a large picture that story seems plausible, but upon closer inspection by simple questioning, the stories will fall apart and we'll start seeing inconsistencies or just differences in their story.* [(Emphasis added.)]

17

¶34 Even more importantly, this factor demonstrates that the Court's artificial line between investigations—traffic impairment and drug investigation, *see* Opinion, ¶ 17—is not accurate. Adams had smelled the marijuana initially, and upon return to the vehicle to get the VIN, he confirmed that smell again. He was not returning to the vehicle merely to obtain the VIN, but to continue the simultaneous drug investigation he had already initiated by checking on the suspects' stories and confirming the marijuana smell—while he was conducting the traffic investigation:

> Q. And then as you approached the vehicle to check the vehicle identification number you engaged in conversation with Mr. McElroy?
>
> A. I did.
>
> Q. Why was it important to talk with him?
>
> A. Based upon my observations of him in the vehicle, my interactions with Mr. Delavergne include what he said, how he said it, as well as his level of nervousness on approach as well as the nervousness of the passenger, I wanted to confirm the story that I was given by Mr. Delavergne with the passenger who was traveling with him.
>
> .  .  .
>
> Q. So you indicated that you had smelled marijuana more than once. You smelled it and you confirmed the smell?
>
> A. Yes.

¶35 The Court also reasons that by the time Adams dispelled any suspicion that Delavergne was driving impaired, "there was no indication Trooper Adams suspected there was marijuana in the vehicle." Opinion, ¶ 16. However, this is also inaccurate. Having already begun his drug investigation, Adams had reached a "suspicion that this was maybe

18

not just mere possession but a little more organized, more organized transport" of illegal drugs prior to completing the traffic investigation. It is of no moment that he took another couple seconds to ask Delavergne about the marijuana smell that he had already begun to investigate, and thus added to the information he had already obtained.

¶36 In my view, Adams made permissible observations about which he explained the criminal significance in detail. While some were innocent in isolation, he wove together a legitimate basis for his "resulting suspicion" that the suspects were trafficking illegal drugs under the totality of the circumstances. He smelled marijuana, confirmed it, and was under no obligation to believe Delavergne's account that the suspects, while admitting their use, had only smoked marijuana "a day or two prior to the trip" in Washington state, which Adams testified did not "sound plausible." He described encountering the smell immediately when he first approached the vehicle. Combined with the other inferences he permissibly drew from his observations based upon his training, I would conclude that his exercise of the canine sniff was supported by particularized suspicion, and affirm.

/S/ JIM RICE

Justice Beth Baker joins the dissenting Opinion of Justice Rice.

/S/ BETH BAKER

19