FILED

08/27/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0644

DA 22-0644

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 188

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

CHRIS LANDON LOBERG,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DC-2021-68
Honorable Jon A. Oldenburg, Honorable Heather Perry,
Presiding Judges

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Jeff N. Wilson, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Tammy K Plubell,
Asisstant Attorney General, Helena, Montana

          Kent Sipe, Fergus County Attorney, Theresa Diekhans, Deputy County
Attorney, Lewistown, Montana

Submitted on Briefs:  June 19, 2024
Decided:  August 27, 2024

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    Following a guilty plea, Chris Landon Loberg was convicted of Criminal Possession of Dangerous Drugs in violation of § 45-9-102, MCA.  He appeals from a May 31, 2022 order of the Tenth Judicial District Court that denied Loberg's motion to suppress the evidence that law enforcement officers found in his vehicle.  Loberg argued there was insufficient particularized suspicion to conduct a canine sniff.  We agree and reverse the District Court.

¶2    We restate the issue on appeal as follows:

*Was there sufficient particularized suspicion to justify a search with a canine around Loberg's vehicle?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    On August 2, 2020, Officer Connelly was driving through the parking lot of the Magic Diamond Casino in Lewistown, Montana.  He noticed a parked vehicle with expired registration tags.  He ran the license plate through the state motor vehicle system and learned that Loberg was the registered owner.  Connelly parked so that he could see the exit from the parking lot and took time to "do some research."  He ran Loberg's name through the Zuercher database (Database), which keeps track of every contact police have with citizens—including calls that come in about others.  These reports are generated whenever an individual calls the police and gives information.  The Database associated Loberg with four or five "drug informational reports" dating back from 2003 to 2017 associating him with others as a "potential distributer or potential user" of drugs.  The reports showed no arrests or convictions for drugs.  As Connelly admitted at the

2

suppression hearing, these specific citizen reports were unsubstantiated: "There was nothing concrete. There was nothing definite, but he was just associated with [drug users or distributors]." The reports raised Connelly's interest in Loberg because he knows that drug users will often associate with one another, and they were the basis for Connelly's belief that Loberg was involved in drug trafficking. Connelly then waited for Loberg to exit the casino.

¶4 After Loberg left, Connelly activated his overhead lights to pull him over. Loberg traveled for approximately two blocks before he pulled over, cresting a hill that, Connelly admitted, "could've been deemed an unsafe area for a traffic stop." Connelly asked where he had been coming from, to which Loberg responded that he had come from a family member's house. Connelly also noticed that he had pinpoint pupils when he examined them with his flashlight, which he recognizes as an indicator of drug *impairment*. Loberg showed no other signs of drug impairment throughout the stop and Connelly did not conduct a driving under the influence (DUI) investigation.

¶5 Connelly then had Loberg get out of the vehicle and speak with his backup partner (Johnson) while Connelly wrote him a citation for the expired registration. Connelly returned with the citation, informed Loberg that they were finished and he was free to leave, and they each walked back towards their respective vehicles.

¶6 Connelly testified that he wanted to further investigate Loberg for possession of dangerous drugs based on his observation of pinpoint pupils, the Database reports, the smell of a "masking agent" coming from the car, and the time of night that he was leaving

3

the casino.[1]  So as Loberg was opening his car door to leave, Connelly asked if he could ask him some more questions.  Connelly informed Loberg that he was not under arrest and Loberg said he understood.  Loberg decided to answer Connelly's additional questions.  Connelly explained that the Database contained reports that Loberg may have been involved in some drug distribution from 2000 to 2017.  Loberg became upset that he was associated with those reports when he was never charged or arrested with anything: "I'm in the system for something I wasn't even doing? . . . That's bullshit."  Loberg said he had never had anything to do with those things and indicated that just because he hangs out with drug users does not mean he is one.  Based on everything he had observed, Connelly decided to detain Loberg and conduct a canine sniff around Loberg's vehicle with Johnson's dog.  The dog alerted on both the driver side and passenger side doors.[2]  Connelly obtained a search warrant and found a bag containing .56 grams of methamphetamine.

¶7    The State charged Loberg with Operating with Expired Registration, a misdemeanor, in violation of § 61-3-312, MCA, Criminal Possession of Dangerous Drugs, a felony, in violation of § 45-9-102(1), MCA, and Criminal Possession of Drug Paraphernalia, a misdemeanor, in violation of § 45-10-103, MCA.  Loberg filed a motion to suppress arguing, among other things, that Connelly did not have particularized

---

[1] Because, according to Connelly, casinos in general "are historically areas where drug users and distributors will frequent and often times it[ has] been documented that dangerous drug transactions have taken place at those locations."

[2] After the dog alerted, Lobert waived his *Miranda* rights and indicated there was a small bag of methamphetamine and some needles in the car.  These post-search and -seizure admissions are not relevant to the issue of whether Connelly had particularized suspicion to conduct the canine sniff. *State v. Hoover*, 2017 MT 236, ¶ 26, 388 Mont. 533, 402 P.3d 1224.

suspicion for the canine sniff. The District Court denied the motion to suppress and Loberg agreed to plead guilty to Criminal Possession of Dangerous Drugs, reserving his right to appeal the denial of the motion to suppress.

## STANDARD OF REVIEW

¶8 We review factual findings in a denial of a motion to suppress for clear error, and we review de novo whether the District Court correctly interpreted and applied the applicable law to those facts. *State v. Noli*, 2023 MT 84, ¶ 24, 412 Mont. 170, 529 P.3d 813. Factual findings are clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or our independent review firmly convinces us that the court was mistaken. *Noli*, ¶ 24. The State has the burden of showing that the subject search or seizure was conducted in accordance with a recognized exception to the warrant and probable cause requirements of the United States and Montana Constitutions. *Noli*, ¶¶ 29, 31.

## DISCUSSION

¶9 *Was there sufficient particularized suspicion to justify a search with a canine around Loberg's vehicle?*

¶10 Generally, government searches and seizures are unlawful under the Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution unless conducted in accordance with a judicial warrant issued on probable cause. *Noli*, ¶ 26. A *Terry* stop is a recognized exception to the warrant requirement. A *Terry* stop allows a law enforcement officer to stop and temporarily detain a person for investigative purposes if they have specific and articulable objective facts, based on the

totality of the circumstances and including reasonable inferences, that lead to an objectively reasonable particularized suspicion that the person is or is about to be engaged in criminal activity. *Noli*, ¶¶ 30–31; *see also* §§ 46-5-401, -403, MCA. This inquiry demands specific articulable information including relevant considerations such as the quantity, substance, quality, and degree of reliability of information known to the officer at the time. *Noli*, ¶ 30. A canine sniff constitutes a search and thus requires particularized suspicion of unlawful activity before an officer can conduct one. *State v. McElroy*, 2024 MT 133, ¶ 13, 417 Mont. 68, 551 P.3d 282.

¶11 Although we review the officer's asserted justification based on common sense probabilities from the perspective of those versed in the field of law enforcement rather than in terms of a library analysis by scholars, law enforcement-specific inferences must still be objectively reasonable under the totality of the circumstances. *Noli*, ¶ 31. Thus, although an officer need not be certain that the subject is engaged in criminal activity, the officer must still articulate more than a mere generalized suspicion or undeveloped hunch of criminal activity to amount to particularized suspicion. *Noli*, ¶ 31.

¶12 When an officer's only bases for suspecting criminal activity are inferences that could be drawn from the conduct of virtually any law-abiding person, the resulting suspicion, by definition, cannot be particularized and is more akin to mere generalized suspicion or an inarticulable hunch of criminal activity. *Noli*, ¶ 32. While this conduct may be a contributing factor in giving rise to particularized suspicion, these observations must be in conjunction with other *specific* indicia of criminal activity. *Noli*, ¶ 32. We have

concluded that certain facts or inferences drawn by officers could be drawn about virtually any law-abiding citizen, such as:

> merely inconsistent accounts of a person's conduct, presence, or plans[;] unusually nervous or defensive behavior when monitored, stopped, confronted, or questioned by police[;] failure to make or maintain eye contact with police[;] use of a borrowed or rented vehicle[;] a messy, cluttered, or disheveled vehicle interior[;] presence at the scene of a crime[;] use of a highway commonly used for drug trafficking or other illegal activity[;] traveling to or from a city or area generally known as a source, destination, or situs of/for illegal drugs or other illegal contraband or activity[;] the desire to avoid contact with police[;] or other perfectly legal or innocuous conduct, behavior, or possessions.

*Noli*, ¶ 32. Otherwise, any driver could be subjected to the perils of profiling and other impermissible motives for initiating traffic stops. *Noli*, ¶ 32 (citing *State v. Reeves*, 2019 MT 151, ¶ 13, 396 Mont. 230, 444 P.3d 394). We have held that the smell of marijuana by itself is sufficient to expand a traffic stop into a DUI investigation. *McElroy*, ¶¶ 14, 17 (citing *State v. Harning*, 2022 MT 61, ¶ 19, 408 Mont. 140, 507 P.3d 145). Even so, "without any facts that are specific and particularized as to the vehicle which would support a suspicion the *vehicle* itself contained illegal drugs, then a traffic stop may not be expanded into a possession of illegal drugs investigation." *McElroy*, ¶ 14 (emphasis in original). Even when stopped for a traffic violation or DUI investigation, a driver retains a right of privacy in their vehicle absent particularized and objective facts relating to the vehicle. *Harning*, ¶ 19.

¶13 If an officer lacks particularized suspicion to conduct a *Terry* stop, and there is no other applicable exception to the warrant requirement, then the search and seizure is unconstitutional and any evidence emanating from the illegal search must be suppressed

(absent an exception to the exclusionary rule not applicable here). *McElroy*, ¶ 15 (citing *State v. Zimmerman*, 2018 MT 94, ¶ 17, 391 Mont. 210, 417 P.3d 289).

¶14     Here, Connelly had particularized suspicion to conduct the initial traffic stop based on Loberg's expired registration. Section 46-5-401, MCA. Additionally, Loberg does not appeal the District Court's conclusion that he voluntarily continued speaking to Connelly after the original purpose for the stop ended. Consent is a recognized exception to the warrant requirement. *State v. Urziceanu*, 2015 MT 58, ¶ 14, 378 Mont. 313, 344 P.3d 399. However, Loberg withdrew consent and was constitutionally seized when Connelly detained him to conduct a canine sniff of his vehicle. *Noli*, ¶ 27. Thus, the issue is whether Connelly had sufficient particularized suspicion to detain Loberg and conduct a drug possession investigation at the time Loberg withdrew his consent.

¶15     The State argues, and the District Court concluded, that Connelly had sufficient particularized suspicion to justify detaining Loberg and conducting a canine sniff based on the totality of the circumstances, namely: Loberg exhibited pinpoint pupils; there was the odor of a "masking agent" coming from the car; Loberg was coming from the Magic Diamond Casino; a number of citizen reports in the police database identified Loberg as a potential drug user or distributor; Loberg did not say that he was coming from the casino when questioned; and he took two blocks to pull over after Connelly activated his overhead lights. Our review of the record shows that the District Court misapprehended the effect of the evidence relating to some of these factors and, considered under the totality of the circumstances, Connelly did not have particularized suspicion to detain Loberg for dangerous drug possession and conduct a canine sniff of his vehicle.

8

¶16 Connelly observed from his flashlight that Loberg had pinpoint pupils. Connelly testified that this "is another indication of *active impairment* and *active use* of . . . dangerous drugs" and might mean that he was "under the influence or impaired by dangerous drugs." Like *Harning* and *McElroy*, pinpoint pupils may, under the totality of the circumstances of a particular case, amount to particularized suspicion for a DUI investigation. *Cf. Harning*, ¶ 19; *McElroy*, ¶ 14. Nevertheless, Connelly did not conduct a DUI investigation because he "had no further observations or indicators to lead [him] towards that direction of criminal activity." Without any objective facts connecting dangerous drugs to a vehicle, pinpoint pupils alone do not amount to particularized suspicion for a possession investigation—though this would be one relevant fact under the totality of the circumstances. *Accord Harning*, ¶ 19; *McElroy*, ¶ 14.

¶17 The District Court also found that there was an odor of a masking agent in the vehicle, which can be used to mask the odor of drugs. However, our review of the record shows that the District Court misapprehended the effect of the evidence in this case and our prior caselaw discussing masking agents. We have accepted that the presence of uncommonly large numbers of air fresheners, or uncommonly strong air-freshener odors, are sometimes used by drug traffickers to mask the smell of large quantities of illegal drugs in vehicles. *See Noli*, ¶ 60 (citing *State v. Estes*, 2017 MT 226, 388 Mont. 491, 403 P.3d 1249; *State v. Roy*, 2013 MT 51, 369 Mont. 173, 296 P.3d 1169). In *Estes*, among other observations such as multiple visible cell phones and cash, the officer detected an *overwhelming* odor from *multiple* air fresheners in the vehicle, which amounted to particularized suspicion. *Estes*, ¶¶ 3, 18, 20. In *Roy*, the "heavy" and "excessive" odor of

9

vehicle deodorizer, along with corroborated information from an informant that the car was carrying a large amount of marijuana and other observations was enough to amount to particularized suspicion. *Roy*, ¶¶ 17–18.

¶18 Here, the effect of the testimony is that Loberg had a single air freshener in his vehicle. Connelly admitted on cross-examination that his personal vehicle also has an air freshener in it, which he does not use to mask the odor of illegal drugs. Connelly further admitted that it was common for car washes to give out air fresheners after a car wash. This is distinguishable from the numerous air fresheners used in *Estes* and *Roy* to mask the odor of illegal narcotics. Additionally, *Estes* and *Roy* each contained additional specific indicia of criminal activity that are not present here.

¶19 The District Court also found it important that Loberg came from the Magic Diamond Casino, which is a business often used for the drug trade. This finding also misapprehended the effect of the evidence. Connelly testified that "the casinos" are historically areas where drug users and distributors frequent and drug transactions often take place at them, that both Luckly Lils and Magic Diamond rise to the same level of drug activity, and that casinos in general are associated with drug activity. Again, while this may be factored into the totality of the circumstances analysis, *see State v. McMaster*, 2008 MT 294, ¶ 23, 345 Mont. 408, 191 P.3d 443, that fact combined with a collection of other totally innocent or innocuous facts does not give an officer particularized suspicion to subject everyone leaving a casino to a canine sniff. *Noli*, ¶ 63; *see also Noli*, ¶¶ 32, 61 (coming from an area generally known for illegal drugs is not enough to rise to particularized suspicion without additional specific, objective facts of criminal activity,

10

otherwise any highway in Montana could be a drug corridor). The facts here are distinguishable from those present in *McMaster*, where the officer observed the defendant engaged in suspicious behavior and had recent information about his major involvement in the drug trade. *McMaster*, ¶¶ 19, 21.

¶20 Loberg's explanation that he was coming from his ex-wife's house when Connelly had seen him parked at the Magic Diamond Casino also aroused his suspicions. Inconsistent accounts of a person's conduct may be factored into the totality of the circumstances but are generally innocuous without specific indicia of criminal activity. *Noli*, ¶ 32. When confronted on this inconsistency, Loberg explained that he was at his ex's house, got gas, and then stopped at the casino to see if a friend was in. Connelly also observed that he did not wait very long before Loberg came out of the casino. It is reasonable for a person to say they are coming from somewhere else when they only briefly stopped at a gas station or a casino. This inconsistency may be considered under the totality of the circumstances, but it does not amount to particularized suspicion when combined with other innocuous behavior. *Noli*, ¶ 32; *McElroy*, ¶ 19.

¶21 The District Court also found it pertinent that there was a "large number of reports" in the Database that associated Loberg with drug users and distributors and thus made him a potential drug user or distributor. These reports may be considered in the totality of the circumstances. *See, e.g.*, *State v. Hesser*, 2024 MT 134, ¶ 13, 417 Mont. 84, 551 P.3d 277. Generally, when an investigative stop stems from a citizen informant's tip, we apply a three-part test to determine its reliability: (1) whether the citizen informant identified themselves and thus exposed themselves to liability if the report is false; (2) whether the

report is based on the citizen informant's personal observations; and (3) whether the informant was reliable. *State v. Deshaw*, 2012 MT 284, ¶¶ 22–24, 367 Mont. 218, 291 P.3d 561. Here, the record does not provide a basis for finding reliability in any of the three factors.

¶22 Additionally, these reports ranged from four years old to more than two decades old. Old, stale reports like this are particularly unlikely to "'indicat[e] that contraband or evidence would presently be at the place to be searched.'" *State v. Tackitt*, 2003 MT 81, ¶¶ 39–40, 315 Mont. 59, 67 P.3d 295 (quoting *State v. Valley*, 252 Mont. 489, 493, 830 P.2d 1255, 1258 (1992)). Connelly had no recent information that tied the old reports to current drug possession. The reports here are particularly untrustworthy and, without more, do not arise to the particularized suspicion necessary to detain Loberg and conduct a canine sniff. Loberg had no criminal drug history. These old, uncorroborated reports, along with the additional observations made by Connelly, did not rise to particularized suspicion.

¶23 Finally, the District Court stated that it took Loberg two blocks to pull over and stop on a road where he could have safely and clearly pulled over. Some people may seek to delay a traffic stop while hiding illicit evidence. However, in this case, the District Court misapprehended the effect of the evidence. Connelly did not testify that he saw Loberg moving about or putting things under his seat or elsewhere. Loberg testified that Connelly activated his lights in the middle of Main Street hill, that Loberg immediately turned on his blinker to indicate that he was going to pull over, and then proceeded to the top of the hill before pulling over. Connelly noted that it is a "pretty steep hill" and that it could have "been deemed an unsafe area for a traffic stop."

12

¶24　Altogether, the totality of the circumstances in this record do not amount to particularized suspicion. The officer acknowledged he did not have sufficient evidence to support a DUI investigation. The evidence at the suppression hearing consisted of "'otherwise perfectly legal or innocuous conduct or behavior'" and not indicia of illegal drug activity. *Noli*, ¶ 32 (quoting *State v. Zeimer*, 2022 MT 96, ¶ 50, 408 Mont. 433, 510 P.3d 100). Loberg's detention and canine sniff were supported by no more than a generalized suspicion or an inarticulable hunch of criminal activity. The State has not provided sufficient evidence to satisfy an exception to the search warrant requirements of the Fourth Amendment to the United States Constitution and Article II, Sections 10 and 11, of the Montana Constitution. The evidence must be suppressed.

## CONCLUSION

¶25　The District Court erred in denying Loberg's motion to suppress. The totality of the circumstances on this record show that Connelly had no more than a generalized suspicion or hunch of criminal activity.

¶26　Reversed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE

13