FILED

06/17/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0444

DA 23-0444

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 122

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

NICOLE LEE HUNT,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 22-58
Honorable Jennifer B. Lint, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Tammy A. Hinderman, Appellate Defender Division Administrator,
Joshua James Thornton, Assistant Appellate Defender, Helena, Montana

       For Appellee:

              Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
Attorney General, Helena, Montana

              William E. Fulbright, Ravalli County Attorney, David Lakin, Deputy
County Attorney, Hamilton, Montana

Submitted on Briefs:  February 19, 2025

Decided:  June 17, 2025

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1      Nicole Lee Hunt appeals from the judgment of conviction entered by the Twenty-First Judicial District Court, Ravalli County, for felony criminal possession of dangerous drugs with intent to distribute.  Hunt challenges the District Court's denial of her suppression motion and the admission of rebuttal evidence during her trial.  We address the following issues:

> *Issue 1: Did the District Court err by finding particularized suspicion existed to expand the scope of a traffic stop into a drug investigation and conduct a canine sniff?*
>
> *Issue 2: Did the District Court err by allowing the State to offer rebuttal evidence of Hunt's prior bad acts on the basis that Hunt's testimony opened the door?*

¶2      We affirm in part, reverse in part, and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3       On January 19, 2022, Detective Nicholas Monaco of the Ravalli County Sheriff's Office observed a silver BMW sedan with no license plates parked outside Apartment 1 of a complex located behind the Rustic Hut in Florence.  Detective Monaco testified that, prior to this time, he had received "some drug intelligence" relating to Apartment 1.  He recalled that he also encountered "folks associated with drugs from that apartment" during previous law enforcement engagements.  Detective Monaco clarified on cross-examination that the intelligence indicated "there was illegal drug activity, specifically the trafficking of methamphetamine from that specific apartment [Apartment 1]."  He conceded the silver BMW was "not specifically associated" with the intelligence, but he saw that car parked in

2

front of Apartment 1 and recalled the intelligence "specifically name[d] Nicole Hunt as someone involved in the drug activity." Detective Monaco stated he knew Hunt to be a resident of Apartment 1.

¶4 At 4:31 p.m., approximately thirty minutes after he observed the parked BMW, Detective Monaco initiated a traffic stop of that vehicle for driving on a public road without license plates. The stop occurred a few blocks from Apartment 1. Hunt was the sole occupant of the car. Hunt opened the driver's side door as Detective Monaco approached on foot. When Detective Monaco explained the reason for the stop, Hunt acknowledged the violation, stating that she recently purchased the car and had not yet registered or insured it. Hunt provided her driver's license. Detective Monaco asked her if she had any documents proving her ownership of the vehicle. Hunt did not, but she stated the title was at her house "right there"—indicating Apartment 1. Detective Monaco asked Hunt if she had anything to drink that day, which she denied. Hunt stated she had been working all day and was returning to work from her home when Detective Monaco stopped her.

¶5 Detective Monaco testified his initial impression of Hunt was that "she seemed in a hurry." He noted that Hunt's eyes were glassy and red. Detective Monaco observed a large black purse and a wallet on the front passenger seat.

¶6 Detective Monaco returned to Hunt's vehicle after providing her information to dispatch. Hunt said she was late for work at the Bear's Lair restaurant and bar. Detective Monaco asked about her shifts that day, and Hunt responded that she worked from 9:00 to 3:30 and from 5:00 to 9:00. Hunt stated that a party started at 4:30. Hunt explained, unprompted, that she left her first shift earlier "at 3:00" because she had a chiropractor

3

appointment and needed to return to work by 4:30 instead of 5:00. When Detective Monaco asked Hunt whether she had consumed any shift drinks or took any medications, Hunt responded she had not. Detective Monaco testified that Hunt's speech was "rapid and almost non-stop chatter," which he inferred as nervousness exhibiting "something to be concealed."

¶7 Hunt offered to participate in sobriety testing. Detective Monaco asked whether there was anything illegal in the vehicle, including paraphernalia, which Hunt denied. Hunt said she had not driven the vehicle because she "didn't want to get in trouble," and then said, "go figure, I get pulled over right down the street from my house." Detective Monaco stated he wanted to complete the sobriety tests "if [Hunt was] willing to participate," because he "wanted to make sure [Hunt] was not impaired at any level," and Hunt seemed "really nervous." Hunt stepped out of the vehicle and explained she gets nervous around law enforcement due to past interactions. Hunt offered again to submit to sobriety testing.

¶8 Hunt called her boss to advise that she would be late. Although he only heard Hunt's side of the conversation, Detective Monaco testified his impression was that Hunt's boss either was unaware of her absence or was "ultra-disappointed in the extended delay."

¶9 Detective Monaco administered a horizontal gaze nystagmus test. He testified he did not detect the presence of nystagmus and did not believe Hunt was under the influence of alcohol. Detective Monaco repeated his observation to Hunt that she seemed extremely nervous, and said he was getting "some indicators" that there was possible drug activity. He again asked if Hunt possessed anything illegal in the vehicle, which she denied. Hunt revealed she had a "dab pen" in her jacket pocket but asserted she used it for marijuana.

4

¶10    Approximately seventeen minutes into the stop, Detective Monaco asked Hunt if it would be "alright if [he] did a quick search" of her vehicle. Hunt initially agreed and unlocked her trunk, but then quickly reversed course. Hunt said she would "rather not" consent and asked whether there would be consequences if she refused. Detective Monaco explained her rapid speech and nervousness indicated possible drug activity, and he requested her "consent to search based on that suspicion." After Hunt equivocated for several minutes about whether she would consent, Detective Monaco returned Hunt's license. Hunt acknowledged her vehicle would have to be towed for lack of registration and insurance. She provided her contact information to Detective Monaco, including her address: Apartment 1.

¶11    Detective Monaco told Hunt she was free to go, but stated he had "particularized suspicion on the vehicle, though." Discovering that she would not be able to remove her purse or other items from the car, Hunt initiated another discussion about consenting to a search. Detective Monaco repeated to Hunt that she was free to leave, but Hunt signed the consent to search form–and remained present during the search. As Detective Monaco searched the car, Hunt reacted to his discovery of a yellow manila-style shipping envelope in her purse. Without being asked, Hunt stated the envelope was not hers. Detective Monaco testified Hunt became "extremely agitated" when she intervened, and based on his training and experience, inferred from her change in demeanor that Hunt was concealing "something illegal." At this point, Detective Monaco considered Hunt's consent revoked and stopped the search without opening the package or seeing its contents. Hunt walked away from the scene shortly thereafter.

5

¶12   Before the car was towed to the Ravalli County Sheriff's Office's secure storage facility, Detective Monaco called for a canine unit. A sniff search of the exterior of Hunt's vehicle indicated the presence of illegal drugs. Detective Monaco obtained a search warrant and executed a search of Hunt's vehicle. The manila envelope recovered in the search was addressed to Trent Parker at an address not associated with Hunt, and the return address was in Victorville, California. Inside the envelope was a clear plastic bag filled with a white crystalline substance weighing approximately one pound that later tested positive for methamphetamine.

¶13   The State charged Hunt with criminal possession of dangerous drugs with the intent to distribute in violation of § 45-9-103, MCA. Hunt moved to suppress the State's evidence as the product of an illegal extension and expansion of the initial traffic stop. After conducting a hearing, the District Court denied Hunt's motion to suppress on the grounds that Detective Monaco had particularized suspicion of illegal drug activity, which justified extending the scope and duration of the traffic stop to engage in a drug investigation and conduct a canine sniff. The court deemed the following facts sufficient to create particularized suspicion of drug activity: Hunt's rapid speech, inconsistent statements, glassy red eyes, jittery movements, and Hunt and the vehicle's association with Apartment 1, a known drug activity location.

¶14   Trent Parker testified during the defense's case-in-chief at the jury trial. The State declined to cross-examine Parker. Hunt testified on her own behalf. Hunt admitted she knew the manila envelope found in her car contained drugs but denied she intended to

distribute those drugs.[1]  Hunt testified the drugs belonged to her dealer and friend, Parker, to whom the envelope was addressed and from whom she planned to purchase 3.5 grams for personal use.  Parker had keys to Apartment 1, previously lived there with Hunt, and often walked her dog.  According to Hunt, on the day she was stopped, she invited Parker to Apartment 1 so he could sell her drugs and perform mechanical work on her car, but she needed to leave for work and did not have time to complete the purchase.  As to how she came to possess the drug-filled envelope, Hunt testified that Parker put it in her car and said he would pick up the car from her workplace after he finished walking her dog.  On direct, the following exchange occurred between Hunt and her counsel regarding the drugs:

COUNSEL: What would have happened if you at any point had attempted to sell those [drugs]?

HUNT: I mean a lot of things could've happened.  With law enforcement, with [Parker], with -- You know, it is a lot of drugs.  I don't want to really think of the consequences of that.

COUNSEL: Did you have the authority to sell them?

HUNT: No. I didn't have the authority –

COUNSEL: Did you have the intention to sell them?

HUNT: No, I did not.

¶15    At the end of Hunt's cross-examination by the State, the State asked:

STATE: But as I understand your testimony, it's that you're a drug user and that you do not sell drugs.

HUNT: Correct.

---

[1] Prior to trial, Hunt stipulated to the fact that she "knowingly possessed" 435 grams of methamphetamine.

STATE: You've never sold drugs in Montana?

HUNT: No, I have not.

¶16 After the defense rested, the State called Katrina Conway as a rebuttal witness. Hunt objected, and the District Court heard arguments without the jury present. The State asserted Hunt's cross-examination testimony that she never sold drugs in Montana opened the door to rebuttal evidence, via Conway's testimony, of the "countless times" Hunt sold Conway drugs before the events at issue in this case. Hunt disputed that her testimony opened the door to Conway's testimony and argued the evidence was unfairly prejudicial and irrelevant to the issue of whether she intended to sell the drugs found in her car on January 19, 2022. The court overruled the objection and permitted the State to call Conway as a rebuttal witness, but it also agreed to consider a M. R. Evid. 404(b) limiting instruction for the jury. The jury did not receive the instruction before Conway testified.

¶17 Conway testified that she was a recovering addict who formerly bought meth from Hunt. Conway estimated she and her ex-fiancé, Kory Babineau, made "a lot more" than one or two purchases. She claimed, during some periods, they met with Hunt every other day, and she estimated the last buy occurred in December 2021 or early January 2022. Conway stated the sales often took place at Apartment 1, where Hunt kept a "black lockbox" under her bed containing paraphernalia, drugs, and "a lot of" cash. Conway asserted she overheard Hunt tell Babineau that Hunt drove her truck to California to pick up drugs and bring them back to Montana. Hunt's counsel recalled Hunt as a witness. Hunt admitted she used drugs with Conway and Babineau and witnessed the pair buy drugs from Parker. Hunt asserted she neither sold them drugs nor drove her truck to California.

After the close of evidence, Hunt moved for a mistrial based on this Court's holding in *State v. Torres*, 2021 MT 301, 406 Mont. 353, 498 P.3d 1256.[2] Hunt argued the State "set the trap" for Hunt to open the door to Conway's rebuttal testimony, which resulted in the admission of unfairly prejudicial prior bad acts evidence without an analysis of the evidence's admissibility under M. R. Evid. 403 or M. R. Evid. 404(b). The District Court denied the motion, ruling "the questioning by the state was legitimate exploration," and Conway's testimony "as a rebuttal witness for credibility was appropriate."

¶18 During its closing argument, the State emphasized Conway's statements, telling the jury: "[Hunt]'s testimony in this case is simply not credible. [Hunt] testified that she's never sold methamphetamine in Montana. Katrina Conway testified to you very clearly that in the month preceding [Hunt's] arrest [Hunt] sold [Conway] methamphetamine multiple times."

¶19 The District Court gave the jury a M. R. Evid. 404(b) limiting instruction, among its other instructions. The jury found Hunt guilty of felony criminal possession of dangerous drugs with intent to distribute.

---

[2] In *Torres*, the defendant testified on direct examination that he had never strangled the victim in that case. *Torres*, ¶ 41. On cross-examination, the State asked him if he had ever strangled anyone, to which he responded that he had not. *Torres*, ¶ 41. The State argued that his testimony on cross-examination opened the door to a rebuttal impeachment witness—the defendant's ex-girlfriend—who testified that he had strangled her in a previous uncharged incident. *Torres*, ¶¶ 16–18. We held that the defendant's direct testimony did not open the door to rebuttal or impeachment evidence, but "[r]ather, the prosecutor's own questions 'set the trap.'" *Torres*, ¶ 41.

**STANDARDS OF REVIEW**

¶20 We review a district court's ruling on a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether the court correctly interpreted and applied the pertinent law to those facts. *State v. Loberg*, 2024 MT 188, ¶ 8, 418 Mont. 38, 554 P.3d 698. Findings of fact are clearly erroneous if they are not supported by substantial evidence, the court misapprehended the effect of the evidence, or if our independent review of the record firmly convinces us that a mistake was made. *State v. Noli*, 2023 MT 84, ¶ 24, 412 Mont. 170, 529 P.3d 813. Whether the court correctly interpreted and applied the law to the facts of the case is a question of law we review de novo. *Loberg*, ¶ 8.

¶21 We review evidentiary rulings, including a district court's decision to allow witness testimony, for an abuse of discretion. *Torres*, ¶ 21. A district court abuses its discretion if its ruling is "based on a clearly erroneous finding of fact, an erroneous conclusion or application of law," or if the court otherwise acted "arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *State v. McGhee*, 2021 MT 193, ¶ 10, 405 Mont. 121, 492 P.3d 518. We review de novo related interpretations or applications of law for correctness. *Torres*, ¶ 21.

**DISCUSSION**

¶22 *Issue 1: Did the District Court err by finding particularized suspicion existed to expand the scope of a traffic stop into a drug investigation and conduct a canine sniff?*

¶23 The Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution, and Article II, Section 11,

10

of the Montana Constitution protect individuals from unreasonable searches and seizures by the government. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961); *Noli*, ¶ 26. Searches and seizures executed without a judicial warrant issued on probable cause are generally unreasonable, subject to limited exceptions. *Loberg*, ¶ 10. Evidence discovered as a result of an unlawful search or seizure may be suppressed in subsequent criminal proceedings against the defendant. *State v. Carrywater*, 2022 MT 131, ¶ 12, 409 Mont. 194, 512 P.3d 1180.

¶24 Temporary investigative stops, such as traffic stops, are seizures excepted from the warrant and probable cause requirements. *State v. McElroy*, 2024 MT 133, ¶¶ 12–13, 417 Mont. 68, 551 P.3d 282. An officer may stop "any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense." Section 46-5-401(1), MCA. A drug-detecting canine sniff of a vehicle is a search within the meaning of the Montana Constitution and requires particularized suspicion of unlawful activity before an officer may conduct one. *Loberg*, ¶ 10.

¶25 To find particularized suspicion, the State must prove the existence of "objective data from which an experienced officer can make certain inferences and a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing." *McElroy*, ¶ 13 (citation omitted). Whether sufficient particularized suspicion exists is a question of fact evaluated under the totality of the circumstances. *Noli*, ¶ 31. This inquiry must be supported by specific articulable information, considering the "quantity, substance, quality, and degree of reliability of information known to the officer at the time." *Loberg*, ¶ 10.

Law enforcement-specific inferences must be objectively reasonable under the totality of the circumstances, and although the standard does not require certainty, the officer must articulate more than a mere "generalized suspicion or undeveloped hunch of criminal activity to amount to particularized suspicion." *Loberg*, ¶ 11.

¶26 Inferences that could be drawn from the conduct of any law-abiding person cannot be the only bases for an officer's suspicion because the resulting suspicion is not particularized. *Loberg*, ¶ 12. Pertinent to this case, we have observed the following facts or inferences could be drawn about virtually any law-abiding person: inconsistent statements concerning a person's conduct, presence, or plans; unusually nervous or defensive behavior when monitored, stopped, confronted, or questioned by police; traveling to or from an area generally known as a source, destination, or situs of/for illegal drugs or other illegal contraband or activity; or other legal or innocuous conduct, behavior, or possessions. *Loberg*, ¶ 12 (citing *Noli*, ¶ 32). Yet such conduct may give rise to particularized suspicion under the totality of the circumstances when made "in conjunction with other *specific* indicia of criminal activity." *Loberg*, ¶ 12 (emphasis in original).

¶27 Hunt does not challenge Detective Monaco's initial stop of her vehicle after he observed her driving on a public roadway without license plates in violation of § 61-3-301, MCA. "A statutory violation alone is sufficient to establish particularized suspicion for an officer to make a traffic stop." *State v. Zimmerman*, 2018 MT 94, ¶ 15, 391 Mont. 210, 417 P.3d 289 (citation omitted). Hunt also acknowledges that Detective Monaco had particularized suspicion to expand the scope of the initial stop into a DUI investigation due to Hunt's glassy red eyes and admitted possession of a marijuana "dab pen."

12

¶28 Even so, a stop "may not last longer than is necessary to effectuate the purpose of the stop." Section 46-5-403, MCA. In order to expand a traffic stop or DUI investigation into one for possession of illegal drugs, there must be specific and particularized facts "as to the vehicle which would support a suspicion the *vehicle* itself contained illegal drugs." *Loberg*, ¶ 12 (citation omitted; emphasis in original). "[A] driver retains a right of privacy in their vehicle absent particularized and objective facts relating to the vehicle." *Loberg*, ¶ 12.

¶29 The District Court found Detective Monaco had sufficient particularized suspicion to justify expanding the scope of the stop into a drug investigation and conduct a canine sniff based on the totality of the circumstances, namely: the vehicle's presence at Apartment 1; Hunt's glassy red eyes and jittery movements; her rapid, continuous, and off-topic speech; and her inconsistent representations about her travels. The District Court also found Detective Monaco had "specific knowledge of drug activity involving the apartment where the vehicle had been."

¶30 Hunt claims the District Court's findings do not demonstrate the existence of sufficient "particularized suspicion that the vehicle itself contained drugs." Hunt contends the circumstances cited by the District Court are equivalent to the innocuous behavior and list of inferences that could be drawn about any law-abiding citizen.

¶31 Citing *State v. Panasuk*, 2024 MT 113, 416 Mont. 430, 549 P.3d 432, Hunt argues Detective Monaco's knowledge of prior criminal activity at Apartment 1 was not paired with reasonable suspicion of current criminal activity. In *Panasuk*, we held that while an officer's knowledge of an individual's prior criminal history cannot form the sole basis to

13

expand a stop into a drug investigation, an officer's knowledge of such history "in conjunction with other factors that *do* foster a reasonable suspicion of *current* criminal activity can be sufficient." *Panasuk*, ¶¶ 20, 22 (emphasis in original). The officer did not have particularized suspicion in that case because the *only* fact he relied upon to expand the scope of the detention into a drug investigation was his knowledge of a prior interaction between Panasuk and a different officer two weeks earlier. *Panasuk*, ¶¶ 5, 20. We noted it was significant that the earlier incident did not provide evidence of Panasuk dealing drugs. *Panasuk*, ¶ 21. By contrast, we determined in *State v. McMaster*, 2008 MT 294, 345 Mont. 408, 191 P.3d 443 that the District Court properly considered the officer's knowledge about the defendant's involvement in the drug trade when evaluating the totality of the circumstances. *McMaster*, ¶ 23. The officer in that case testified the vehicle he stopped was registered to the defendant, who the officer believed to be a drug dealer. *McMaster*, ¶ 21. The officer based this inference on information shared by other law enforcement agencies, evidence linking the defendant to the drug trade the officer discovered during a warranted search, and statements by a person the officer arrested on a prior occasion implicating the defendant in drug activity. *McMaster*, ¶ 21.

¶32 The facts in this case are more akin to the facts in *McMaster* than *Panasuk*. Detective Monaco testified he had specific information that methamphetamine was being trafficked from Apartment 1. Other individuals implicated Apartment 1 as a known drug activity location when Detective Monaco encountered them during other law enforcement activities. He observed Hunt's vehicle parked in front of Apartment 1 only thirty minutes before the stop, and Hunt said that was the location where she lived and from where she

14

departed immediately before being stopped. While these facts alone may not have provided a sufficient basis for expanding the stop, when considered in conjunction with Hunt's demeanor and appearance at the time of the stop, they provided a resulting suspicion that Hunt and her vehicle may currently be involved in drug activity. Hunt argues that "[u]nder that logic, every resident of the apartment complex would be involved in the drug trade." But Detective Monaco's information as to the drug trafficking history was not generalized to the apartment *complex*; it was specific to Apartment 1 and to Hunt herself. Moreover, it was not just Detective Monaco's understanding of Hunt and Apartment 1's history that provided the basis for expanding the stop; it was that history considered in conjunction with Hunt's specific appearance and the manner in which she conducted herself during the stop. Hunt herself acknowledges that Detective Monaco had particularized suspicion to expand the scope of the initial stop into a DUI investigation due to her glassy red eyes and admitted possession of a marijuana "dab pen." Although any one of these factors alone may not have provided a basis for expanding the stop, we do not consider the factors individually when determining whether there was particularized suspicion for expanding the stop; we view them in their totality.

¶33 Hunt argues Detective Monaco's suspicions about Apartment 1 were "far too generalized" to support a finding of particularized suspicion based on the vehicle's presence there. It is true that traveling from an area *generally* known for illegal drugs, on its own or combined with other innocuous behavior, is not enough to rise to particularized suspicion. *Loberg*, ¶ 19. In *Loberg*, we found that the defendant's presence at a casino—a location known to be frequented by drug users and distributors—and his "pinpoint pupils"

15

were insufficient to create particularized suspicion for a canine sniff. *Loberg*, ¶¶ 16, 19. We reasoned that coming from an area generally known for drugs, like a casino or from one city to another, cannot form the sole basis of particularized suspicion because it would subject every person leaving the casino or traveling on a highway to an extended detention or canine sniff. *Loberg*, ¶ 19 (citing *Noli*, ¶¶ 32, 61). But in this case, Hunt fails to account for the *specific*, objective facts known to Detective Monaco about Apartment 1, Hunt's association with Apartment 1, and the close timeline in which Detective Monaco observed the car in front of Apartment 1, coupled with Hunt's admission she had just left Apartment 1 when he stopped her. Apartment 1 is not open to the public—unlike a casino—nor is it a public roadway. Nor would every resident of the apartment complex be subject to search and seizure, because Detective Monaco's knowledge about drug activity was specific to Apartment 1. The District Court found Detective Monaco had specific information resulting in a suspicion of wrongdoing concerning the activities occurring at Apartment 1. In reviewing a district court's findings, we do not consider whether the evidence could support a different finding, nor do we substitute our judgment for that of the district court regarding the weight given to the evidence. *In re V.F.A.*, 2005 MT 76, ¶ 7, 326 Mont. 383, 109 P.3d 749. "It is the district court's responsibility to weigh the evidence presented and ascertain witnesses' corresponding credibility." *In re V.F.A.*, ¶ 7.

¶34 "Determining whether particularized suspicion supports an investigative stop does not deal with hard certainties, but with probabilities." *McMaster*, ¶ 23 (citation omitted). The assessment of the reasonableness of the scope of an investigative stop "must recognize that the State's compelling interest in effective law enforcement" requires officers in the

16

field to have reasonable latitude when confirming or dispelling suspicions of criminal activity. *State v. Laster*, 2021 MT 269, ¶ 13, 406 Mont. 60, 497 P.3d 224 (citation omitted). The record in this case includes objective facts relating to Hunt and her vehicle from which Detective Monaco could reasonably infer Hunt was currently engaged in narcotics activity based on his specific knowledge of Apartment 1 as a known drug activity and methamphetamine trafficking location, his observation of the vehicle at Apartment 1 thirty minutes before the stop, Hunt's association with Apartment 1, and her representation that she had just left Apartment 1 when she was stopped. These specific indicia of criminal activity—when considered in conjunction with Hunt's glassy red eyes, erratic speech and movements from which Detective Monaco reasonably could infer nervousness atypical of a minor traffic stop, and her inconsistent statements about her travels that day—support the District Court's finding that particularized suspicion of narcotics activity justified expanding the scope of the investigation and conducting a canine sniff under the totality of the circumstances. *See Noli*, ¶ 32 (otherwise innocuous conduct may contribute to totality of the circumstances when other specific indicia of criminal activity present). The District Court did not err by denying Hunt's motion to suppress.

¶35 *Issue 2: Did the District Court err by allowing the State to offer rebuttal evidence of Hunt's prior bad acts on the basis that Hunt's testimony opened the door?*

¶36 The Montana Rules of Evidence generally prohibit admitting evidence of a person's "other crimes, wrongs, or acts" for the purpose of proving conformity with the person's actions in the present case. M. R. Evid. 404(b). Nevertheless, when a defendant "opens the door, or broaches a certain topic that would otherwise be off limits," the State is entitled

17

"to offer evidence in rebuttal, including evidence of other acts." *State v. Guill*, 2010 MT 69, ¶ 39, 355 Mont. 490, 228 P.3d 1152 (citation omitted). "Rebuttal evidence offered by the State is proper only if it tends to counteract a new matter *offered by the defense* and has a tendency to contradict or disprove that evidence." *State v. Jackson*, 2009 MT 427, ¶ 68, 354 Mont. 63, 221 P.3d 1213 (emphasis added) (citing *State v. Gardner*, 2003 MT 338, ¶ 36, 318 Mont. 436, 80 P.3d 1262).

¶37 Hunt argues the District Court committed reversible error by admitting rebuttal evidence of uncharged acts. Hunt claims that the District Court based its decision on an erroneous conclusion that Hunt's testimony opened the door to such evidence. Analogizing the facts in this case to *Torres*, Hunt asserts that denying her intent to sell the drugs she stipulated to possessing did not open the door to cross-examination about or rebuttal evidence of prior bad acts. Hunt contends Conway's testimony was irrelevant to the charged conduct and unfairly prejudicial.

¶38 The State's position as to the purpose for which it offered the rebuttal evidence has been somewhat of a moving target. At trial, the State initially argued that Hunt's answers to the prosecutor's final questions during cross-examination opened the door to evidence that Hunt sold Conway drugs on previous occasions. When objecting to Hunt's mistrial motion, the State asserted that it offered Conway's testimony to impeach Hunt's credibility and contended that calling Conway to testify that she had previously purchased meth from Hunt somehow did not constitute the admission of prior bad acts, "although that may be a consequence of challenging her veracity."

¶39 On appeal, the State maintains Hunt opened the door to rebuttal evidence by testifying that she "only" used methamphetamine and by identifying Parker as the owner of the drugs. The State argues Conway's testimony tended to contradict or disprove that evidence, a finding it claims we may imply from the District Court's analysis distinguishing this case from *Torres*. Alternatively, the State suggests the District Court reached the right result by admitting the rebuttal evidence for the wrong reason.

¶40 The District Court ruled Hunt opened the door to rebuttal evidence due to "those open-ended questions of 'have you ever,'" reasoning:

> It is because in Ms. Hunt's testimony not only did she state she had no intent to distribute these drugs, which would not have opened the door. *What opened the door was, No, I never distributed drugs in the State of Montana.* So the State is entitled to come in with evidence that demonstrates or doesn't that that has happened.

(Emphasis added.)

¶41 The District Court acknowledged that such evidence "might go into the 404(b) other bad acts, which has the limiting instruction that [the jury] can't assume that she's acted in conformity therewith. [Conway] absolutely is an impeachment witness, and I think it is square on point."

¶42 After Hunt brought *Torres* to the District Court's attention, the court's reasoning expanded to account for the State's cross-examination questions regarding Hunt's prior bad acts. In distinguishing *Torres*, the District Court determined Hunt's denial of intent to sell the drugs at issue "invite[d] a question of, [h]ave you ever sold," which was different than *Torres,* because in that case, "the issue wasn't whether or not he had ever strangled anybody. It was whether he had strangled this person. The state brought in someone else

19

he had strangled to say, [l]ook, he did it to this gal. He's going to do it to another one." The District Court determined the cross-examination questions were "legitimate exploration," and Hunt's responses opened the door to testimony from a "rebuttal witness for credibility."

¶43 In *Torres*, the defendant was charged with strangulation of a partner or family member, among other offenses. *Torres*, ¶ 1. The defendant testified during direct examination that he had never strangled the victim in that case. *Torres*, ¶¶ 28, 41. On cross examination, the State asked the defendant if he had ever strangled another person; he answered no. *Torres*, ¶¶ 28, 41. After the defense rested, the State argued it was entitled to call the defendant's ex-girlfriend as a rebuttal witness because the defendant denied strangling other people on cross-examination. *Torres*, ¶ 16. The trial court allowed the defendant's ex-girlfriend to testify about his alleged strangulation of her as impeachment evidence. *Torres*, ¶ 17. The defendant's ex-girlfriend testified the defendant strangled her during an uncharged and unreported incident several years earlier. *Torres*, ¶ 18. We determined the lower court erroneously admitted the ex-girlfriend's testimony about the prior strangulation incident, stating:

> "[T]he State engaged in a sharp practice. While Torres provided direct testimony denying he had ever strangled [the victim], the first time he categorically denied strangling anyone else was in response to the State's explicit questioning on cross. The prosecutor's line of questioning Torres's prior acts on cross-examination was error. Torres did not open the door that would provide something to rebut or impeach. Rather, the prosecutor's own questions set the trap."

*Torres*, ¶ 41 (internal punctuation omitted).

20

¶44 The circumstances of this case are analogous to *Torres*. Hunt's defense in this case was that while she knew there were drugs in the envelope, they belonged to Parker and she neither intended nor had the authority to sell them. On direct examination, Hunt acknowledged being a user of methamphetamine. But the first time Hunt "categorially denied" selling drugs in Montana or elsewhere "was in response to the State's explicit questioning on cross." *Torres*, ¶ 41. Hunt did not make a strategic decision to give those answers to the jury, the State did. Put another way, Hunt did not open the door, the State did.[3]

¶45 The Concurrence and Dissent adopts the characterization that the District Court grafted on to Hunt's defense strategy: "I don't sell; therefore, I didn't have the intent to sell." Concurrence and Dissent, Swanson, C.J., ¶ 66. Yet the evidence presented during Hunt's defense tells a story that does not match that characterization. The record before us shows that the defense cabined its inquiries to the issue of Hunt's intent to sell the drugs found in her possession; it never introduced the issue of whether she did or did not sell drugs generally. We are presented, in other words, with an explanation for the District

---

[3] If Hunt had "already opened the door to the State rebuttal witness before the last [cross-examination] question," as Chief Justice Swanson's Concurrence and Dissent contends, then the State could have raised that argument when the alleged door-opening testimony was given during the defense's examination, and not immediately following the improper questions about Hunt's prior bad acts at the conclusion of the State's cross-examination. Concurrence and Dissent, Swanson, C.J., ¶ 73. The analysis of the record presented by the Concurrence and Dissent is neither the argument the State made to the District Court nor the justification the District Court employed to support its conclusion that the door was open to evidence of Hunt's prior bad acts. The State and District Court explicitly relied on Hunt's cross-examination testimony to permit Conway's rebuttal without reviewing the record until *after* Conway testified and over Hunt's objection that she had not opened the door. We cannot ignore the sequence of events and the disconnect between the explanation given and the record, which indicates the justifications for admitting Conway's testimony were contrived.

Court's decision that is incongruent with the testimony elicited by the defense on direct examination. The Concurrence and Dissent does not point to any record evidence presented by the defense relating to prior incidents of Hunt *selling* drugs; rather, it acknowledges Hunt testified that she was "not a drug dealer" and that she did not sell drugs in response to cross-examination by the State—the exact problem we identified in *Torres*. Concurrence and Dissent, Swanson, C.J., ¶¶ 69–73. Taking the Concurrence and Dissent's argument to its conclusion, a defendant's mere denial of the charged offense would always open the door to cross-examination about and rebuttal evidence of the defendant's previous criminal conduct. This would render the rules governing the admission of prior bad acts evidence meaningless and revive the problem our holding in *Torres* sought to address. The Concurrence and Dissent is correct that the defendant's "prior conduct or status as a woman-choker was not at issue" in *Torres*. Concurrence and Dissent, Swanson, C.J., ¶ 76. But neither was Hunt's alleged prior history of selling drugs at issue in this case. The only conduct for which the State charged Hunt was possessing and intending to distribute the package of drugs found in her car. The prior incidents alleged by Conway were totally divorced from those drugs; Conway never testified to seeing Hunt in possession of the package, and Conway testified the final sale to her occurred, at a minimum, several weeks before the events at issue in this case.

¶46 The State also fails to explain how Hunt's direct testimony about Parker introduced a new matter warranting rebuttal evidence when Detective Monaco's direct testimony and the prosecutor's opening statement both referred to Parker's potential involvement. On this point it is also noteworthy and telling that the State did not ask Conway a single

22

question about Parker or about the drugs for which the State charged Hunt during the State's examination of her. Hunt "did not open the door that would provide something to rebut or impeach." *Torres*, ¶ 41. The District Court erred by concluding Hunt's testimony opened the door to cross-examination about and rebuttal evidence of prior uncharged conduct, and it abused its discretion by permitting Conway's testimony on those grounds. The District Court was obligated to balance the probative value of Conway's testimony regarding Hunt's prior bad acts against the risk such testimony would result in unfair prejudice against Hunt. *Torres*, ¶ 42 (citing M. R. Evid. 403; *State v. Madplume*, 2017 MT 40, ¶ 32, 386 Mont. 368, 390 P.3d 142).

¶47 More implausible than Hunt's story is the idea that the State was "not trying to get Hunt to testify she did not commit any prior crime," but rather it intended to "help the jury appreciate the likelihood" that Parker and Hunt dealt drugs together. Concurrence and Dissent, Swanson, C.J., ¶ 77. The State unequivocally asked Hunt whether she sold drugs, clearly "trying to get Hunt to testify" she did not. The State's decision to not cross-examine Parker, and the dearth of questions about Parker during the State's rebuttal examination of Conway, discredit any claim that the State offered Conway's testimony for the purpose of understanding the relationship between Hunt and Parker. Moreover, it is undisputed that the State's first argument regarding the admissibility of the rebuttal evidence was predicated on Hunt's cross-examination denial of prior criminal conduct.

¶48 We may not reverse a defendant's conviction unless the record shows that the defendant suffered prejudice by the improper admission of evidence. *Torres*, ¶ 45 (citing § 46-20-701(1), MCA). Prejudice to the defendant exists "where there is a reasonable

23

probability that the inadmissible evidence contributed to the conviction." *Torres*, ¶ 45 (citing *State v. Gowan*, 2000 MT 277, ¶ 9, 302 Mont. 127, 13 P.3d 376; *State v. Van Kirk*, 2001 MT 184, ¶¶ 29, 47, 306 Mont. 215, 32 P.3d 735).

¶49 Evidence of prior bad acts may be unfairly prejudicial if "it arouses the jury's hostility or sympathy for one side without regard to its probative value, if it confuses or misleads the trier of fact, or if it unduly distracts from the main issues." *Madplume*, ¶ 33 (citing *State v. Hicks*, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149). The improper admission of Conway's rebuttal testimony compromised the integrity of Hunt's trial. In its closing argument, the prosecutor reminded the jury that Hunt "sold [Conway] methamphetamine multiple times," and summarized Conway's testimony by stating Conway "had the courage to come in here today and say, [']Yeah, that person at some point in my prior life when I had a problem, that person contributed to that problem[']." The State's use of this evidence carried significant danger that the jury would find Hunt guilty because Conway alleged that Hunt previously engaged in similar conduct. Unlike *Torres*, where we held the improper admission of prior bad acts evidence via rebuttal testimony was not prejudicial because the jury acquitted the defendant of the strangulation offense, the jury in this case convicted Hunt of the only offense tried. Our review of the record leads us to conclude there is a reasonable probability the jury convicted Hunt due to the erroneous admission of Conway's testimony.

**CONCLUSION**

¶50 The District Court's denial of Hunt's suppression motion is affirmed. The District Court abused its discretion by permitting Conway's testimony after erroneously concluding

24

Hunt's testimony opened the door. There is a reasonable probability that the introduction of this evidence compromised the integrity of Hunt's trial. Hunt's judgment of conviction is reversed, and this case is remanded for a new trial.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ BETH BAKER

Justice Laurie McKinnon, concurring and dissenting.

¶51    I agree with the Court's decision to reverse based on the introduction of improper rebuttal evidence. However, I dissent from the Court's conclusion that Detective Monaco possessed particularized suspicion to expand the scope of the initial traffic stop.

¶52    A *Terry* stop, as an exception to the general warrant requirement, allows law enforcement to "stop and temporarily detain a person for investigative purposes if they have specific and articulable objective facts, based on the totality of the circumstances and including reasonable inferences, that lead to an objectively reasonable particularized suspicion that the person is or is about to be engaged in criminal activity." *State v. Loberg*, 2024 MT 188, ¶ 9, 418 Mont. 38, 554 P.3d 698 (citing *State v. Noli*, 2023 MT 84, ¶¶ 30-31, 412 Mont. 170, 529 P.3d 813). For a traffic stop, such as here where the driver failed to display license plates, the "tolerable duration of police inquir[y] is . . . limited to the justified purpose or mission of the stop[,]" specifically the traffic violation that warranted the stop and any associated safety concerns of the officer. *Noli*, ¶ 33 (quotation omitted).

25

It is axiomatic that the duration of such a stop "may not last longer than is necessary to effectuate the purpose of the stop." Section 46-5-403, MCA; *Noli*, ¶ 33.

¶53 Here, Detective Monaco initially stopped Hunt for driving a vehicle without license plates. At the hearing on Hunt's motion to disclose the confidential informant, Detective Monaco explained that he quickly initiated a valid impaired driving investigation of Hunt, which dispelled suspicions that she was under the influence. Ostensibly, the stop should have ended at this point. *Noli*, ¶ 35. However, the initial stop, premised on Hunt's lack of license plates, then expanded to a drug investigation. The relevant question for the Court thus becomes whether Detective Monaco possessed the requisite particularized suspicion to extend the stop and expand the scope of his investigation based upon his suspicions regarding possible criminal activity associated with Apartment 1.

¶54 Expansion of the scope of a traffic stop is justifiable "[i]f based on additional specific and articulable facts observed or discovered during the lawful scope and duration of the initial stop" develops "a new or expanded particularized suspicion of criminal activity." *Noli*, ¶ 35 (quotation omitted). The stop "must end without further delay" once the officer

> has dispelled the predicate particularized suspicion that justified the initial stop within its lawful scope and duration, failed to observe or discover additional specific and articulable facts justifying expansion of the scope or duration of the stop based on a new or expanded particularized suspicion of criminal activity, and completed or reasonably should have completed the valid purpose or mission of the stop[.]

*Noli*, ¶ 35 (quotations omitted). The inquiry into whether an officer has an objectively reasonable particularized suspicion "demands specific articulable information known to

the officer at the time." *Loberg*, ¶ 9 (citing *Noli*, ¶ 30). We have refused to accept "inferences that could be drawn from the conduct of virtually any law-abiding person" as little more than "mere generalized suspicion or an inarticulable hunch of criminal activity." *Loberg*, ¶ 12 (citing *Noli*, ¶ 32). Rather, law enforcement must demonstrate that their observations of particular behavior operate "in conjunction with other *specific* indicia of criminal activity." *Loberg*, ¶ 12 (citing *Noli*, ¶ 32) (emphasis in original). Indeed, in *Noli* we provided an exhaustive survey of some of these otherwise legal behaviors which alone and without additional indicia cannot provide particularized suspicion:

> Merely inconsistent accounts of a person's conduct, presence, or plans[;] unusually nervous or defensive behavior when monitored, stopped, confronted, or questioned by police[;] failure to make or maintain eye contact with police[;] use of a borrowed or rented vehicle[;] a messy, cluttered or disheveled vehicle interior[;] presence at the scene of a crime[;] use of a highway commonly used for drug trafficking or other illegal activity[;] travelling to or from a city or area generally known as a source, destination, or situs of/for illegal drugs or other illegal contraband or activity[;] the desire to avoid contact with police[;] or other perfectly legal or innocuous conduct, behavior, or possessions.

*Noli*, ¶ 32 (citation omitted). Otherwise, we continued, drawing such "'inferences of nefariousness' from no more than inarticulable hunches 'subject[s] drivers to the perils of profiling and other impermissible motives for initiating traffic stops.'" *Noli*, ¶ 32 (quoting *State v. Reeves*, 2019 MT 151, ¶ 13, 396 Mont. 230, 444 P.3d 394).

¶55 While the Court correctly assesses the standard for particularized suspicion found in our *Loberg* and *Noli* holdings as requiring more than generalized information that an area or situs hosts illegal drug activity, the Court then grants undeserved credence to Detective Monaco's assertion that drug activity occurred specifically within Apartment 1

27

despite a lack of any support in the record demonstrating specific facts giving rise to a particularized suspicion. Opinion, ¶ 31. Analogizing the instant case to *State v. McMaster*, 2008 MT 294, 345 Mont. 408, 191 P.3d 443, the Court reasons that Detective Monaco's suspicions reasonably arose from "specific information" known to him. Opinion, ¶ 32. However, and in contrast to the instant case, the facts giving rise to law enforcement's particularized suspicion at issue in *McMaster* related directly to McMaster himself, to the vehicle registered in his name, and to information gained from other investigations including collaborative work between regional law enforcement agencies. *McMaster*, ¶ 21. Another law enforcement officer had even witnessed McMaster and his colleagues "transfer a box from one vehicle to the other." *McMaster*, ¶ 19. We further distinguished *McMaster* in *Loberg*, focusing on the conduct observed by law enforcement and that the information relied upon was recently acquired as a point of divergence between the two cases. *Loberg*, ¶ 19 (citing *McMaster*, ¶¶ 19, 21). The officer in *Loberg* predicated his particularized suspicion on the defendant's quick stop at a casino bearing a notorious reputation for drug activity. *Loberg*, ¶ 19. Ultimately, we reasoned that, while generalized associations of criminal activity with casinos might factor into a totality of the circumstances analysis, simply concluding that "coming from an area generally known for illegal drugs is not enough to rise to particularized suspicion without additional specific, objective facts of criminal activity," lest "any highway in Montana could be a drug corridor." *Loberg*, ¶ 19 (citing *Noli*, ¶¶ 32, 61, 63).

¶56    The instant case involves a detective acting on a generalized suspicion arising from seeing a vehicle parked in front of Apartment 1 which he later witnessed travelling in the

28

general vicinity of the apartment complex.[1]  Hunt explained to Detective Monaco that she was returning to work after feeding her animals at her home and visiting a chiropractor—all legal activities.  When asked if she possessed any drug paraphernalia, Hunt responded affirmatively that she had a legal "dab pen."  She then successfully completed the field sobriety tests administered by Detective Monaco.  Detective Monaco provided no specific information to tie Apartment 1 to illicit activity: neither he nor his "source" had witnessed any hand-to-hand deals occur within the premises.  Travelling from an area generally known for illegal drugs might establish particularized suspicion when balanced with the totality of the circumstances but does not provide the necessary justification to intrude upon the right to privacy when contextualized only with other totally innocent or innocuous facts.  *Loberg*, ¶ 19; *Noli*, ¶¶ 32, 61.

¶57    Detective Monaco's offered "firsthand knowledge of drug activity in the exact apartment," included apprehending "a wanted drug addict"[2] there and knowledge of vehicles frequently coming and going.  However, Detective Monaco's testimony did not elucidate whether these instances occurred during the period of Hunt's tenancy or how they helped establish particularized suspicion for Hunt's vehicle.  Further, Detective Monaco then admitted that he personally had not seen hand-to-hand drug transactions and that he

---

[1] This is a generous framing of the reasons for the initial stop, which the District Court, in the order denying disclosure of the confidential informant, found "was based on the vehicle's lack of license plates, not any intelligence provided by an informant."

[2] Detective Monaco's testimony regarding this fact is vague as to whether the individual was simply apprehended in the apartment, resided there with or without Hunt, or was simply arrested on an outstanding warrant and not caught contemporaneously engaging in criminal activity.

could not confirm whether his confidential informant had witnessed the same. Detective Monaco then clarified that he does not refer to this unnamed individual as an informant, but rather a "source" who had not received any specific information regarding drug activity in Apartment 1 "as of late." Hunt's BMW itself could not be "associated specifically" with the intelligence regarding criminal activity occurring in Apartment 1. At trial, Detective Monaco explained his suspicions, based upon "general intelligence," that "Hunt might be up to some criminal activity." On cross-examination, he reiterated his suspicions stemmed from general concern or general intelligence of drug activity. Again, he could not confirm that his "source" or "confidential informant" could definitively state that hand-to-hand drug deals occurred within Apartment 1.

¶58 Accepting Detective Monaco's generalized suspicions as sufficient is clearly erroneous because the District Court misapprehended the effect of attenuated, largely benign facts to find particularized suspicion of illegal drug activity to extend the traffic stop. Our caselaw contains multiple instances in which similar facts failed to give rise to a particularized suspicion meriting the expansion of a traffic stop into a drug investigation. In *Loberg*, we held that the evidence offered consisted of otherwise perfectly legal or innocuous conduct or behavior and was thus inadequate to support a finding of "particularized suspicion" to justify detention and a canine search. *Loberg*, ¶ 24. Likewise, in *State v. Harning*, 2022 MT 61, ¶ 29, 408 Mont. 140, 507 P.3d 145, we held that law enforcement impermissibly extended a traffic stop into a drug investigation on the basis of little more than "an undeveloped, generalized suspicion" that the vehicle may have contained drugs. In *State v. Carrywater*, 2022 MT 131, ¶ 26, 409 Mont. 194, 512 P.3d

30

1180, we reversed the denial of a motion to suppress because the law enforcement officer lacked particularized suspicion to extend the traffic stop based upon the driver and passenger switching seats in the vehicle and the nervousness of the parties subject to the search. Law enforcement failed to articulate objective facts that indicated anyone in the vehicle was using or trafficking illegal drugs. *Carrywater*, ¶ 26. In *State v. McElroy*, 2024 MT 133, ¶ 20, 417 Mont. 68, 551 P.3d 282, we held an officer observing signs of hard travel in the subject's vehicle, the subject "traveling from a known drug center in a third-party's vehicle," and the subject's "nervous demeanor" did not provide sufficient evidence to support a particularized suspicion. And we held in *State v. Broken Rope*, 278 Mont. 427, 432-33, 925 P.2d 1157, 1160 (1996), that there was nothing inherently suspicious in a series of innocuous behaviors which could give rise to inferences resulting in a particularized suspicion that the defendant was or had been engaged in criminal activity.

¶59 In *State v. Panasuk*, 2024 MT 113, ¶ 23, 416 Mont. 430, 549 P.3d 432, a case very much on point to the facts presented here, we reversed a denial of a motion to suppress evidence obtained when an officer expanded the scope of the initial traffic stop into a drug investigation purely because of the officer's awareness of the driver's prior suspected drug involvement. There, the officer initiated a traffic stop after seeing Panasuk pulling a trailer without a license plate. *Panasuk*, ¶ 18. He then continued the stop "based solely on Panasuk's [criminal] history and on information he had received" regarding Panasuk's suspected dealing of illegal drugs in another jurisdiction weeks earlier. *Panasuk*, ¶ 18. We concluded that the officer impermissibly premised the expansion of the stop on prior

suspected drug involvement which could not give rise to a "reasonable suspicion of *current* criminal activity." *Panasuk*, ¶ 22 (emphasis in original).

¶60 Here, in affirming the denial of Hunt's motion to suppress, the Court renders a cursory assessment of the "objective facts" available to and articulated by Detective Monaco as supporting reasonable inferences of ongoing criminal activity. Opinion, ¶ 34. Detective Monaco's representations regarding Apartment 1 lack reliability and arise from admittedly general suspicions. Detective Monaco stopped the vehicle for failure to display license plates. The Court acknowledges, as Hunt herself did, the totality of the circumstances—Hunt's demeanor, her glassy red eyes, and admitted possession of a "dab pen," Opinion, ¶ 32—gave rise to Detective Monaco's particularized suspicion to expand the stop into a DUI investigation, but Hunt's successful completion of the field sobriety test should have then dispelled further scrutiny. Upon citing her for failing to have license plates and administering a successful field sobriety test, the stop should have then concluded. Instead, based solely on generalized suspicions of criminal activity related to an apartment, not germane to the vehicle or to Hunt herself and located beyond the vicinity of the traffic stop itself, Detective Monaco expanded the stop. Particularized suspicion to stop Hunt for failing to display her license plates existed and that stop developed particularized suspicion to administer a field sobriety test, but none of those factors related to Apartment 1. *Panasuk*, ¶ 22.

¶61 The Court's decision creates a gap in Montana's right to privacy by which law enforcement might designate a private residence as involved in "illegal drug activity" and thereby subject individuals associated with such a residence to heightened and continual

32

scrutiny in perpetuity. Any practical deference towards a law enforcement officer's asserted justification based on experience cannot diminish the duty of this Court to determine the objective reasonableness of those inferences.

¶62 Based on the foregoing, I dissent from the Court's conclusion that this was a constitutional expansion of the initial traffic stop. I concur in all other respects with the Court's decision.

/S/ LAURIE McKINNON

Justices Ingrid Gustafson and Katherine M. Bidegaray join in the Concurrence and Dissent of Justice Laurie McKinnon

/S/ INGRID GUSTAFSON
/S/ KATHERINE M BIDEGARAY

Chief Justice Cory J. Swanson, concurring and dissenting.

¶63 I concur with the Majority on Issue 1. I dissent on Issue 2.

¶64 The District Court did not act arbitrarily or exceed the bounds of judgment when it determined Hunt opened the door to the State's rebuttal witness. The court's view of Hunt's theory of defense was supported by the record. Additionally, the court was supported by the law when it distinguished Hunt's case from *Torres*. Thus, the court did not abuse its discretion.

¶65 "We review evidentiary rulings for abuse of discretion." *State v. Smith*, 2021 MT 148, ¶ 14, 404 Mont. 245, 488 P.3d 531 (citation omitted). "A district court abuses its discretion when it acts arbitrarily without the employment of conscientious judgment or

33

exceeds the bounds of reason, resulting in substantial injustice." *Smith*, ¶ 14 (citation omitted). "A district court's evidentiary rulings must be supported by the rules and principles of law; therefore, to the extent that a discretionary ruling is based on a conclusion of law we must determine whether the court correctly interpreted the law." *Smith*, ¶ 14 (citation omitted; internal quotations omitted; ellipsis omitted).

¶66 The Majority highlights Hunt's theory of the case as "while she knew there were drugs in the envelope, they belonged to Parker, and she neither intended nor had the authority to sell them." Opinion, ¶ 44. However, the District Court correctly saw the theory as more complex. The District Court concluded the defense was: "I don't sell; therefore, I didn't have the intent to sell." The court did not abuse its discretion in allowing the State to challenge that defense theory.

¶67 Initially, as the Majority notes, the District Court allowed the rebuttal witness, explaining:

> Mr. Boyd, this is the peril, unfortunately, with Ms. Hunt's history and asking those open-ended questions of "have you ever." So I do think that the door has been opened, but I also agree that we need to know the circumstances and the witness.

¶68 Later, after reviewing the record, the District Court acknowledged it incorrectly determined the defense counsel asked Hunt if she ever bought drugs. However, the District Court explained:

> I would say that your articulated defense of "she didn't intend to sell because that's not what she does" invites a question of, "Have you ever sold?" And I think that's distinguishable from *Torres* because in *Torres* the issue wasn't whether or not he had ever strangled anybody. It was whether he had strangled this person. The state brought in someone else he had strangled to say, "Look, he did it to this gal. He's going to do it to another one."

34

(Internal quotation marks added for clarity).

¶69    The defense called alleged drug dealer Parker to testify ahead of Hunt. Parker stated he knew Hunt fairly well. She had helped him during his mother's illness, and he had helped her with her dog. He had also worked on several of her cars from time to time. Parker acknowledged he had been informed there was a package with drugs inside, and it had his name on it. He recited the address of his mechanics shop, which was the address on the mailing label for the drug package. He also acknowledged law enforcement tried to interview him and he did not speak to them, relying on his Fifth Amendment right to remain silent. The defense did not delve any deeper into this subject on direct examination, and the State declined to cross-examine him. It appears there was a trial tactical game of chicken going on with Parker's testimony, and both sides pulled back from asking one too many questions of this witness.

¶70    Immediately following Parker, Hunt testified Parker was the owner of the drugs. She acknowledged she was a drug user—indeed a long-term addict. She stated she had an ongoing user-dealer relationship with Parker. The jury heard the two were familiar enough with each other that Parker had lived with her at one point, he had keys to the apartment, and he seemed to be able to come and go as he pleased.

¶71    Hunt testified Parker had received a large package of methamphetamine (435 grams) in the mail, and he brought the entire package over to her house to then open it and sell her a small user amount called an eight-ball (3.5 grams). Parker ostensibly took on this high-risk transport of the entire wholesale drug shipment (rather than one retail

baggie) so he could pick up Hunt's unregistered vehicle, thereby increasing his chances of being pulled over with the entire shipment on the way back to his mechanics shop. However, Hunt claimed she changed the plan because she was late for work, so she took all the drugs and the car. In the meantime, Parker was deprived of his tens of thousands of dollars of drugs, and without the vehicle he was supposed to repair. This new plan frustrated all three of Parker's objectives: selling Hunt a small user amount; keeping the rest of his drugs safe; and retrieving Hunt's vehicle so he could repair it.

¶72 The defense added several other self-incriminating items to this narrative before the State cross-examined Hunt. On direct examination, Hunt said she had been clean but relapsed when she "got caught up with the wrong people," and had been buying drugs from Parker for about a year. She testified law enforcement had searched her vehicle on other occasions, not just the traffic stop which led to this case. And then her counsel asked what would have happened if she had attempted to sell the package of drugs. Hunt's answer implied she would be in trouble with Parker, as she did not have the "authority" to sell the drugs. Then she followed up that she did not have the "intention" to sell the drugs.[1]

¶73 Hunt concluded her cross-examination by confirming her testimony that she was a drug user, not a drug dealer. That was before the final question and answer to which the Majority objects, in which the State asked if she had ever sold drugs in Montana. In my

---

[1] Even without the later disputed admissions, Hunt's testimony likely would have convicted her of the same offense on the prosecution theory of Accountability, §§ 45-2-301 through -303, MCA, had the State sought a conviction in this way.

36

view, Hunt had already opened the door to the State rebuttal witness before the last question.

¶74 The District Court did not abuse its discretion in finding the State was entitled to ask the question of whether she had ever sold drugs in Montana, and it correctly ruled Hunt had opened the door to the State's rebuttal testimony. After hearing the testimony, the District Court concluded Hunt argued she never dealt drugs; she was merely a drug user. The record supports this conclusion. The District Court then correctly distinguished the testimony from the facts in *Torres*.

¶75 The Majority now holds these questions make the situation analogous to *Torres*. I disagree. The following are not "sharp questions," they are holding Hunt accountable for the evidence she already presented on direct examination that she was engaged in ongoing conduct which gave rise to indices of drug possession with the intent to distribute:

> STATE: As I understand your defense, it's that you're a person who struggles with a methamphetamine addiction and you don't sell drugs. Is that correct?
>
> HUNT: Correct. I work.
>
> .   .   .
>
> STATE: But as I understand your testimony, it's that you're a drug user and that you do not sell drugs.
>
> HUNT: Correct.
>
> STATE: You've never sold drugs in Montana?
>
> HUNT: No, I have not.

¶76 These questions are distinguishable from *Torres*, where the prosecution introduced the issue of prior or ongoing conduct, not the defendant:

STATE: You understand how serious cutting off someone's air supply is, don't you, Mr. Torres?

TORRES: Yes, I do. (Chuckles.)

STATE: You said you never did that to Bri.

TORRES: Never.

STATE: You said you never did that to anyone.

TORRES: I've never done that to anyone.

STATE: You've never done that to anyone, including Bri.

TORRES: Including Bri.

STATE: Or anyone else.

TORRES: Not that I can remember, no. No, I've never strangled anybody.

STATE: Or cut off someone's air supply.

TORRES: Or cut off their air. Not that I can recall.

STATE: Or cut off their circulation.

TORRES: No.

*Torres*, ¶ 28. The prosecution's questioning in *Torres* came out of nowhere. Torres's prior conduct or status as a woman-choker was not at issue. Torres did not argue, "I don't choke people," or "I'm not a woman-choker, therefore I never choked her." Had he done so, the result of that case would have presumably been different. Here, on the other hand, the District Court correctly concluded Hunt put on a defense of, "I'm a drug user, not a drug dealer," and its logical extension, "I don't sell; therefore, I didn't have the intent to sell."

38

¶77 The prosecution did not trick Hunt, engage in sharp practice, or abuse the rules of cross-examination. It locked Hunt into her theory of defense. The difference between *Torres* and here is that the prosecution was not trying to get Hunt to testify she did not commit any prior crime; the prosecution was trying to attack Hunt's story to help the jury appreciate the likelihood that Parker and Hunt were dealing drugs together. Hunt sailed too close to the wind in her testimony by trying to minimize her role. She essentially admitted she knowingly possessed drugs and Parker was, at a minimum, using her to store and transport them. In doing so, the defense opened the door for the State to confront her with evidence of her drug-dealing activity, which contradicted her sworn testimony denying the same.

¶78 I would affirm the conviction because the District Court did not abuse its discretion in allowing the State to present a rebuttal witness to Hunt's sworn testimony.

/S/ CORY J. SWANSON

Justice Jim Rice joins the Concurrence and Dissent of Chief Justice Cory J. Swanson.

/S/ JIM RICE